PUBLIC REDACTED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| **DAINGEAN TECHNOLOGIES LTD.,** | |
| **Plaintiff,** | **Civil Action No. 2:23-cv-123-JRG** |
| **vs.** | |
| **AT&T CORP., AT&T MOBILITY LLC, AT&T MOBILITY II LLC AND AT&T SERVICES INC.,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |
| **ERICSSON INC.,** | |
| **Intervenor,** | |
| **NOKIA OF AMERICA CORPORATION,** | |
| **Intervenor.** | |

## DEFENDANTS' MOTION TO STRIKE #2: *DAUBERT* MOTION TO EXCLUDE DAMAGES EXPERT OPINIONS OF STEPHEN E. DELL

████████████

# TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................1

II.     DELL'S DAMAGES MODEL .............................................................................2

III.    LEGAL STANDARD ...........................................................................................3

IV.     ARGUMENT .........................................................................................................3

        A.    Mr. Dell's starting point of total customer revenue violates
              Federal Circuit precedent. ...........................................................................3

        B.    Mr. Dell's damages opinion fails to apportion. ..........................................6

              1.    Mr. Dell fails to apportion customer revenue for other non-
                    network-related benefits and services. ............................................6

              2.    Mr. Dell's assumption that ████ of infringing customer
                    revenue is attributable to the '803 patent is improper because
                    it relies on (a) unreliable technical opinions, and (b) is not
                    supported by economic evidence. .....................................................6

              3.    Mr. Dell's peak data traffic adjustment of ████ is
                    unreliable because it is based on automobile traffic data. ...........8

              4.    Mr. Dell fails to apportion for the value of technology
                    required to create a 5G network. ......................................................9

              5.    Mr. Dell's division of profits based on ROIC is unreliable. .......10

        C.    Mr. Dell's report seeks to introduce immaterial information.
              ..................................................................................................................12

              1.    Mr. Dell's discussion of AT&T's cumulative revenue and
                    profits is immaterial. .....................................................................12

              2.    Mr. Dell's discussion of the cost of spectrum is irrelevant .........13

              3.    Mr. Dell's discussions of Ericsson and Nokia licenses should
                    be excluded. ...................................................................................13

              4.    Mr. Dell's discussion of two Ericsson papers is immaterial. .......14

              5.    Mr. Dell's discussion of 5G networks is irrelevant. ....................15

V.      CONCLUSION ...................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*CliniComp International, Inc. v. Athenahealth, Inc.*,
2020 WL 13111151 (W.D. Tex. Dec. 14, 2020) ....................................................11

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993)..............................................................................................3, 12

*Ericsson, Inc. v. D–Link Sys., Inc.*,
773 F.3d 1201 (Fed. Cir. 2014)..................................................................................4

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)....................................................................................................3

*LaserDynamics v. Quanta Computer, Inc.*,
694 F.3d 51, 67 ...........................................................................................................4

*Limelight Networks, Inc. v. XO Commc'ns, LLC*,
2018 WL 678245 (E.D. Va. Feb. 2, 2018)................................................................11

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
904 F.3d 965 (Fed. Cir. 2018)............................................................................3, 4, 5

*Provisur Techs., Inc. v. Weber, Inc.*,
No. 2023-1438, 2024 U.S. App. LEXIS 24862 (Fed. Cir. Oct. 2, 2024) ..............4, 5

*Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*,
752 F.3d 807 (9th Cir. 2014) ...................................................................................12

*Uniloc USA, Inc. v. Microsoft Corp.*,
632 F.3d 1292 (Fed. Cir. 2011).......................................................................5, 6, 10

*VirnetX, Inc. v. Cisco Sys., Inc.*,
767 F.3d 1308 (Fed. Cir. 2014)..................................................................................4

OTHER AUTHORITIES

Fed. R. Evid. § 702 .......................................................................................................3

███████████████

## I.    INTRODUCTION

Daingean's damages expert, Mr. Dell, opines that total damages in this case should be ███████████████████ (before excluding ██████████). Mr. Dell reaches this figure by making a series of flawed and unreliable assumptions.

Mr. Dell inflates his damages figure by starting with AT&T's customer revenue (which includes services unrelated to network performance) instead of the cost of the allegedly-infringing equipment (5G cellular base stations) that Daingean identifies as the SSPPU. Starting with this flawed royalty base overstates the damages figure by more than 1180%.

Aside from this fatal flaw, Mr. Dell makes a series of compounding errors:

- Based on testimony from Daingean's expert Dr. Kowalski, ███████████████ of the customer revenue that he estimates to be generated by infringing devices (specific 5G cellular base stations) to the '803 patent. But even if Dr. Kowalski's opinions were reliable (and they are not), there is no economic evidence establishing that a ██████ increase in throughput or spectral efficiency of base stations is somehow tied to ██████ of customer revenues.

- Next, Mr. Dell reduces the royalty base because the '803 patent is relevant *only* during peak data traffic times. But Mr. Dell relies on peak **automotive** traffic data to estimate the amount of time there is peak *data* traffic, and provides no evidence of any link between the two.

- Other than the analysis by Dr. Kowalski, Mr. Dell makes no further apportionment. He thus ignores the significant technical benefits provided by other features, especially features included in the 5G cellular standard.

- Finally, Mr. Dell concludes that, as part of a hypothetical negotiation, ████████ ███████████████████████████████ based on AT&T's "return on invested capital" (ROIC). But ROIC has no connection with how much profit AT&T would share with a patent holder generally, nor the '803 patent in this case.

Separately, Mr. Dell also lines his opinion with references to irrelevant information that bear no relation to the facts of this case. As set out below, Mr. Dell's damages theory is flawed from inception, and must be entirely excluded.

1

████████████████████

## II.    DELL'S DAMAGES MODEL

Mr. Dell's damages reports conducts a hypothetical negotiation to estimate a reasonable royalty.[1] However, Mr. Dell begins with an improper starting point, and then fails to properly apportion for the value of non-infringing features.

- Mr. Dell starts his analysis with AT&T's customer revenue paid by its mobility customers for cellular and non-cellular services. Mr. Dell assumes that all customer revenue is for either "data or voice" services within the United States, and does not apportion for any other services provided by the smartphone plan (e.g. free HBO Max subscription or services in Mexico or Canada).

- Next, Mr. Dell reduces his figure to the percentage of customer revenue he estimates to be generated by the 5G part of AT&T's network (████) and to infringing 5G base stations (████) during the license period.[2]

- Next, Mr. Dell relies on Dr. Kowalski's analysis to attribute ████ of the remaining revenue to the '803 patent because the '803 patent increases throughput and spectral efficiency by ████.

- Next, again relying on Dr. Kowalski's explanation that the '803 Patent functions during ████████████████████ Mr. Dell estimates the percentage (in time) that AT&T's network operates at ████████. To do so, Mr. Dell references automobile traffic data as a proxy for cellular data traffic to further adjust the revenue base by ████████████████████.[3]

- Next, Mr. Dell calculates profits using AT&T's overall net profit margin. He then discounts the profits to calculate a lump-sum range.[4]

---

[1] All references to exhibits are to the Declaration of Blake Bailey filed October 17, 2024 (the "Bailey Declaration") in support of this Motion.

████████████████████

[2] Ex. 6, Deposition Transcript of Mr. Stephen Dell, taken October 15, 2024 ("Dell Deposition") at 67:1-15, 88:8-89:21.
[3] Ex. 1, Dell First Report, at ¶¶ 288-89.
[4] Ex. 1, Dell First Report, at Attachment 3.1.

██████████████

- Finally, Mr. Dell assumes that during a hypothetical negotiation ████████████
████████████████████████████████████████████████████

Mr. Dell concludes that the hypothetical negotiation would result in a lump-sum license of ████

████████ Ex. 1, Dell First Report at ¶ 323.[6]

## III.    LEGAL STANDARD

The admissibility of expert testimony is analyzed under Rule 702 of the Federal Rules of

Evidence, which imposes a "gatekeeping" function on district courts. *Daubert v. Merrell Dow*

*Pharm., Inc.*, 509 U.S. 579, 597 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137,

141 (1999). Courts fulfill this role by attending to "the task of ensuring that an expert's testimony

both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.

The burden of demonstrating that expert testimony is relevant and reliable falls on the proponent

of the expert. *Daubert*, 509 U.S. at 590-91.

## IV.    ARGUMENT

### A.    Mr. Dell's starting point of total customer revenue violates Federal Circuit precedent.

The Court should strike Mr. Dell's damages theory because his royalty base starts with

AT&T's entire-market customer revenue, and not the smallest salable patent practicing unit (which

Daingean identifies)[7] embodying the patented invention ("SSPPU"), as required by law.

In calculating compensation, "the value to be determined is only the value that the

infringing features contribute to the value of an accused product." *Power Integrations, Inc. v.*

---

[5] Ex. 1, Dell First Report, at ¶¶ 292-93.

[6] ████████████████████████████████████████████████
████████ Ex. 3, Dell Second Supp. Report, Attachment 9.

[7] Daingean identified the infrastructure base station as the smallest saleable patent practicing unit. Ex. 4, Plaintiff's Corrected First Amended Disclosure of Asserted Claims and Preliminary Infringement Contentions Pursuant to P.R. 3-1 & P.R. 3-2 Document Production Accompanying Disclosure, dated May 3, 2023 ("Plaintiff D&C"), at 2-3; Ex. 1, Dell First Report, at ¶¶ 5-6.

*Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018). This principle gives rise to the rule of apportionment, which requires a patentee to select a starting point (the royalty base) and then apportion the defendant's profits and the patentee's damages between patented features and unpatented features. *Id.*; *see also Provisur Techs., Inc. v. Weber, Inc.*, No. 2023-1438, 2024 U.S. App. LEXIS 24862, at *15 (Fed. Cir. Oct. 2, 2024).

When a patentee accuses a multi-component product of infringement and seeks reasonable-royalty damages, the selected royalty base cannot be larger than the SSPPU. *Id.* This is because "use of the entire market value of a multi-component product that includes a patented component…'cannot help but skew the damages horizon for the jury, regardless of the contribution of the patented component to this revenue.'" *Id.* (quoting *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1320 (Fed. Cir. 2011)).[8] In other words, using the entire value of a product as the base, even if apportioned, will mislead the jury. Courts curtail this risk by excluding claims premised on royalty bases that are not appropriately limited to the SSPPU. *Ericsson, Inc. v. D–Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014).[9]

---

[8] The entire market value rule, which Mr. Dell invokes by selecting AT&T's entire customer revenue as his royalty base, is a "narrow exception" to the rule restricting the royalty base to, at most, the SSPPU. *LaserDynamics v. Quanta Computer, Inc.,* 694 F.3d 51, 67. Specifically, a patentee may use the entire market value of the accused product as the royalty base only if "the feature patented constitutes *the* basis for consumer demand." *Power Integrations*, 904 F.3d at 978 (emphasis added); *see also*
*Provisur*, 2024 U.S. App. LEXIS 24862, at *15-16 (finding use of entire market value impermissible because analysis was not based on SSPPU and the expert failed to present sufficient evidence that the patented features in question "drove demand for the entire slicing line."). If the accused product has "other valuable features" that "cause consumers to purchase the product," as is unquestionably the case here, using entire market value is inappropriate. *Id.* at 979; *see VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1329 (Fed. Cir. 2014). The patentee must show "that the patented feature *alone* motivates customers to purchase the infringing product in the first place." *Id.* (emphasis added).

[9] *See also LaserDynamics,* 694 F.3d at 67 ("[w]here small elements of multi-component products are accused of infringement, calculating a royalty on the entire product carries a considerable risk that the patentee will be improperly compensated for non-infringing components of that product.").

As described above, Mr. Dell's damages calculation starts with the customer revenue generated by AT&T's network and then narrows to customer revenue he estimates to be generated by the infringing part of AT&T's 5G network. In doing so, he ignores the SSPPU that Daingean itself identifies (the 5G base station). Ex. 4, Plaintiff D&C, at 2-3. This choice inflates his royalty damages by more than 1180%. *See* Ex. 5, Rebuttal Report of Melissa Bennis, dated Oct. 2, 2024 ("Bennis Rbt. Rpt.") at ¶ 256.

Mr. Dell's use of customer revenue as the starting point for his royalty base is an unsubtle attempt to artificially inflate damages, and is inconsistent with binding case law regarding the permitted royalty base in patent damages calculations.

- *First*, Mr. Dell does not provide any evidence, such as consumer studies, to demonstrate that the '803 Patent drives demand for AT&T's network. In fact, he tacitly admits the exact opposite.[10]

- *Second*, AT&T's network is based on the 5G cellular standard, which includes a host of other patented features. As such, it is inappropriate for a royalty base to begin with customer revenue.

- *Third*, Mr. Dell offers no evidence that ***any*** of AT&T's customer revenue (or profit) is linked to the '803 Patent in any way. *See Uniloc*, 632 F.3d at 1321. At best, There is no evidence demonstrating how customers value the specific improvements provided by the '803 Patent specifically or that AT&T would have lost any customers by failing to implement the '803 Patent.

- *Fourth*, there is no license or industry practice supporting patent royalties based on customer revenue.[11] In fact,

---

[10] *See Power Integrations*, 904 F.3d at 979; *Provisur Techs., Inc. v. Weber, Inc.*, No. 2023-1438, 2024 U.S. App. LEXIS 24862, at *16 (Fed. Cir. Oct. 2, 2024) (noting that even where an expert claimed that the patent at issue drove the demand for the underlying technology, it was impermissible to use an entire market royalty base absent actual evidence that the patented features drove demand for the entirety of the technology).

[11]

Because Mr. Dell's apportionment begins with this improper royalty base, the Court should strike his damages conclusion as a matter of law. *Id.* at 1317 ("Beginning from a fundamentally flawed premise and adjusting it based on legitimate considerations specific to the facts of the case nevertheless results in a fundamentally flawed conclusion.").

**B.    Mr. Dell's damages opinion fails to apportion.**

**1.    Mr. Dell fails to apportion customer revenue for other non-network-related benefits and services.**

Mr. Dell fails to apportion the customer revenue paid by U.S. customers for products/services other than U.S. 5G data traffic or voice. AT&T's phone plans include several benefits and services that are not related to data traffic or voice service on its U.S. network. For example, Cricket (owned by AT&T) data plans include free cloud storage and some plans include a free subscription to HBO Max.[12] AT&T smartphone plans include security services, including apps that block spam phone calls or conduct identity monitoring. Some AT&T smartphone plans allow for unlimited services in 20 Latin American countries (where the '803 patent is unenforceable). They also include access to services that have nothing to do with 5G, such as the core network which routes voice, data, and video traffic across disparate network systems. By starting with all customer revenue for AT&T's U.S. customers, Mr. Dell fails to apportion for these other products/services.

**2.    Mr. Dell's assumption that ██████ of infringing customer revenue is attributable to the '803 patent is improper because it relies on (a) unreliable technical opinions, and (b) is not supported by economic evidence.**

Mr. Dell directly attributes ██████ of customer revenue generated by the allegedly infringing part of AT&T's 5G network to the '803 Patent, based on Dr. Kowalski's technical

---

[12] Ex. 6, Dell Deposition at 54:7-56:14.

█████████████

testimony that the '803 patent ████████████████████████████████████ This is

improper.

To start, as discussed in a contemporaneous Motion to Strike, Dr. Kowalski's technical

opinions are flawed and unreliable. *See* Defendants' Motion to Strike #3: *Daubert* Motion to

Exclude Dr. Kowalski's Discussion of Technical Benefit of the '803 Patent. If Dr. Kowalski's

opinions are unreliable, then Mr. Dell's damages model is as well.

Separately, assuming *arguendo* that Dr. Kowalski's technical opinions are reliable, then

Mr. Dell's analysis is still flawed because he offers no *economic* evidence that a ████████

███████████████████████████████████ means that ███████ of network revenue is

attributable to that improvement.

*First,* consumers value much more than just throughput: security, price, customer service,

reliability, brand, coverage, and network quality, to name a few. Ex. 7, Deposition Transcript of

Ms. Kristen Lucas, dated Aug. 14, 2024 ("Lucas Deposition"), at 102:14-25; Ex. 8, AT&T Form

10-K for 2023, at 6; Ex. 9, KPMG Telecom Consumer Survey, at 9. And Mr. Dell has neither

conducted nor cited any consumer surveys to gauge the value of throughput to consumers relative

to these and the many other features that make cellular technology (and specific carriers or plans)

desirable. Mr. Dell has not provided evidence that consumers *even notice* the alleged throughput

improvement, much less make spending decisions based on throughput.

*Second,* assuming the existence of a ████████████████████████, it is only

possible because there is a fully functioning 5G network. Importantly, the improvement allegedly

enabled by the '803 Patent is

. In other words, the existence of ████████ improvement is caused by the

███████████████████

combined contributions of cellular 5G technology <u>and</u> the '803 patent features. Mr. Dell does nothing to apportion the value of this ██████ improvement between the '803 patent and the functions provided by 5G cellular technology.

*Third*, a direct correlation between throughput or spectral efficiency and share of revenue is economically unsound. Several technologies have improved throughput/spectral efficiency by well over 100%, including MIMO technology and carrier aggregation, as well as generational advances in the standards and other technology which have multiplied throughput and general download speeds by many thousands. Ex. 5, Bennis Rbt. Rpt. at ¶¶ 261-64. Mr. Dell has done nothing to consider the relative importance of a ██████ improvement compared to these other technologies.

Accordingly, Mr. Dell's use of the alleged █████ throughput improvement as an apportionment of AT&T profits, without *any* consideration as to how throughput correlates to profit and how other significant contributions are allocated amongst the apportionment of profits, is flawed and must be excluded.

3. **Mr. Dell's peak data traffic adjustment of ████ is unreliable because it is based on <u>automobile</u> traffic data.**

Based on discussion with Dr. Kowalski, ████████████████████████████
████████████████████████████████████████ Mr. Dell agrees that any royalty base must be apportioned for this. Ex. 1, Dell First Report at ¶¶ 288-89. Mr. Dell attempts to apportion for ████████████████████████
████ However, instead of relying on reliable data of peak data traffic in AT&T's cellular network, Mr. Dell relies on data about peak <u>automobile</u> traffic. *Id.* at ¶ 289. Based on vehicle traffic data from the National Highway Traffic Safety Administration, Mr. Dell concludes that commuter ██████ represents ████████████████████████, and then

8

██████████████

assumes that the same ████ of traffic is peak data traffic.

Mr. Dell's reliance on U.S. Highway traffic data renders his entire analysis unreliable. Mr. Dell demonstrated no link—through a technical witness or otherwise—between peak automobile traffic and peak cellular data traffic in any way. None exists. Instead, he purports (in a footnote) to                                                                   :

████████████████████████████████████████████

*Id.*, at 95, n.414. As shown above, this quote has *nothing* to do with peak data traffic. Instead, it simply compares the share of uplink data traffic between dense urban areas (████) and rural areas (████). *See* Ex. 10, Traffic Patterns and Network Design, Ericsson Mobility Report, at 5. This comment by Ericsson regarding the ratio between downlink data and uplink data use in cities does not represent cumulative cellular traffic, much less cellular traffic corresponding to Mr. Dell's selected                    .

Accordingly, Mr. Dell's                    adjustment is not supported by sufficient facts or data, and is untethered from actual mobile device peak traffic hours and data consumption. Because this adjustment is unreliable, the ultimate conclusion should be excluded.

### 4. Mr. Dell fails to apportion for the value of technology required to create a 5G network.

In addition to making flawed apportionments, Mr. Dells also *fails* to apportion for critical factors, including the other technology that makes the 5G cellular network function and the '803 Patent's features possible. Mr. Dell fails to consider the tens of thousands of other patents that have been declared to the 5G standard, as well as the other patents and technologies used by AT&T in the Accused Products that have not been declared essential to the 5G standard. Ex. 11, Buggenhagen, Pohlmann, Richter, Who is Leading the 5G Patent Race?, at 4. While the exact number of essential patents is unknown, there is no doubt that operation of the 5G cellular network

requires infringement of many 5G standard essential patents. Based on the various studies estimating the number of essential patents, Ms. Bennis estimates that between 1,185 to 4,888 U.S. patents are essential to operation of a 5G network. Ex. 5, Bennis Rbt. Rpt. at ¶ 287. ████████ ████████████████████████████████████████ demonstrating that Ericsson owns patents essential to operating 5G RAN infrastructure equipment.[13] Mr. Dell failed to consider the many thousands of patents that the manufacturers of the Accused Base Stations infringe to operate the 5G cellular standard, and his staggering royalty figure, in light of the potential royalty demands on these other patents, is unreasonable and should be excluded.

### 5.     Mr. Dell's division of profits based on ROIC is unreliable.

Separately, Mr. Dell's profit division is also unreliable. ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

Mr. Dell's allocation of incremental profit is speculative and unconnected to the facts of the case, not unlike the ████████████████ 25% "rule of thumb" profit allocation expressly disavowed in *Uniloc*, 632 F.3d at 1315. Mr. Dell offers no evidence whatsoever connecting AT&T's company-wide ROIC to ***any*** investment by AT&T in intellectual property, much less patented technology. Indeed, ROIC is a metric of overall financial performance, not a financial target set by management. Because it is a company-wide metric, ROIC is an average of the entire business and does not reflect specific ventures or company sectors. It also includes capital that fails to generate a return at all, which deflates the figure. *See* Ex. 5, Bennis Rbt. Rpt. at ¶ 271. In

---

[13] Ex. 12, Deposition of P. Delgado, taken July 26, 2024 ("Delgado Deposition") at 143:9-17, 186:5-188:20.

short, ROIC has no bearing on what AT&T would seek in licensing negotiations.

Estimating division of profit based on ROIC also creates absurd results. ROIC can (and often does) fall below 0%. The Dell approach would conclude that the patent holder would receive *more than 100%* of the incremental profits generated by an infringing patent in the event that ROIC is below 0% for a particular company. Moreover, ROIC fluctuates wildly from quarter to quarter and year to year, as the company as a whole has varying performance. For example, Nokia's annual ROIC went from -14% in December 2020 to 17% in December 2022. There is nothing to suggest that Nokia's willingness to accept certain profit splits would fluctuate so wildly over the course of two years. *See* Ex. 13, Nokia ROIC Historical Data. Finally, according to a survey of companies listed on the Russell 3000 by Morgan Stanley, most companies have a ROIC of 40% or lower, with the most common ROIC's between 5% and 15%. Ex. 14, Return on Invested Capital, Morgan Stanley, at 29. Under Mr. Dell's theory then, nearly all companies would agree to forgo the bulk of their profits to patent holders.

*See CliniComp International, Inc. v. Athenahealth, Inc.*, 2020 WL 13111151, at *4 (W.D. Tex. Dec. 14, 2020) (excluding profit split analysis as unrelated to the accused functionality because the expert relied on an analyst report from Defendant that stated that the company averaged a 10% improvement in collections); *see also Limelight Networks, Inc. v. XO Commc'ns, LLC*, 2018 WL 678245, at *3 (E.D. Va. Feb. 2, 2018) (excluding allocation of incremental revenues based on defendant's weighted average cost of capital, which was calculated based on, *inter alia*, "debt, cash flows, the company's size, and its assets" as "fancy guesswork"

that did "not consider the actual stakes in the hypothetical negotiation or even the specific patents negotiated") (emphasis omitted).

### C.    Mr. Dell's report seeks to introduce immaterial information.

Mr. Dell uses his report to introduce data and documents wholly unrelated to his purported analysis. The Court should strike this information. It is the patent holders' burden to show that proffered expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. As to relevance, the testimony must be properly applied to the facts at issue. *See Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 813 (9th Cir. 2014) ("Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry."). Mr. Dell incorporates irrelevant information into his expert report, including AT&T's company-wide revenue and profits and two unrelated Ericsson presentations. Mr. Dell also submits irrelevant analyses regarding the cost of spectrum and the value of 5G. None of this information has "a valid connection to the pertinent inquiry" in this case. *Id.*

### 1.    Mr. Dell's discussion of AT&T's cumulative revenue and profits is immaterial.

Daingean seeks to use Mr. Dell's testimony to discuss AT&T's financials, including its revenue, profits, and income margins, which are irrelevant to determining a reasonable royalty.[14] As discussed above, AT&T's revenue is completely improper for use as a royalty base as a matter of law and must be excluded. Beyond its use as the input for Mr. Dell's legally flawed royalty base, AT&T's revenue has no relevance to Mr. Dell's report, and Mr. Dell has presented no evidence or analysis to the contrary. Accordingly, any mention of AT&T's revenue must be excluded.

---

[14] *See, e.g.,* Ex. 1, Dell First Report at ¶¶ 25, 45-48, 204, 211, 314, Figures 2, 3, 4, Attachments 3.1, 3.2, 4, 4.2, 4.3,  6, 6.1, 6.2, 6.3, 6.4.

### 2.      Mr. Dell's discussion of the cost of spectrum is irrelevant.

Mr. Dell's report is sprinkled with immaterial references to AT&T's recent acquisitions of spectrum and the costs thereof. Ex. 1, Dell First Report at ¶¶ 52-55, 218, 291, 307, 321, 326, 329. However, the price AT&T has paid for mid-band spectrum has no relation to the profit allegedly generated by implementation of the '803 Patent. Mr. Dell has offered no evidence regarding AT&T's use of its available spectrum or whether AT&T would acquire additional spectrum absent the '803 Patent's features. Further, Mr. Dell asserts that the technical benefits of the '803 Patent apply only                    and Mr. Dell has not connected the operation of the '803 Patent under these limitations with the cost of spectrum in any way. Spectrum is therefore immaterial to Mr. Dell's analysis and any references to the cost of spectrum of AT&T's purchase of spectrum should be excluded.

### 3.      Mr. Dell's discussions of Ericsson and Nokia licenses should be excluded.

Mr. Dell discusses several Ericsson and Nokia licenses, suggesting that they provide evidence supporting his analysis. Ex. 1, Dell First Report at ¶¶ 255-56. This is improper.

**Nokia Licenses.** Mr. Dell's report discusses all of Nokia's patent licenses produced in this case—both where Nokia licenses its own portfolio and where Nokia takes a license to other's patents. Mr. Dell's report suggests that he will use certain Nokia licenses as in this case. This is improper.

Accordingly, the Court should strike any reference by

████████████████████████

Mr. Dell to the Nokia licenses.[15]

**Ericsson Licenses.** Mr. Dell's report discusses all of Ericsson's patent licenses produced in this case—both where Ericsson licenses its own portfolio and where Ericsson takes a license to other's patents. Mr. Dell's report suggests that he will use certain Ericsson licenses as

in this case. This, again, is improper.

Accordingly, the Court should strike any reference by Mr. Dell to the Ericsson licenses.

### 4.    Mr. Dell's discussion of two Ericsson papers is immaterial.

Mr. Dell also discusses two Ericsson presentations: ██████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████ claiming that both

Ex. 15, ███████████ ; Ex. 16, ███████████ , Ex. 1, Dell First Report at ¶ 282.
This is improper for several reasons. Both presentations evaluate *Ericsson's* 5G cellular patent portfolio, which Mr. Dell has not economically compared to the '803 Patent. As discussed above, while Daingean has identified four patents (out of tens of thousands) that are technically comparable to the '803 Patent, Mr. Dell does not try to apportion the value of those four technically

---

[15] ███████████████████████████████████
██████████████ . AT&T does not move to strike that testimony.

comparable patents to the rest of Ericsson's portfolio, nor has he tried to compare the relative value of the '803 Patent against Ericsson's entire patent portfolio. Further, both presentations involve Ericsson's 5G SEP portfolio related to *smartphones*, not infrastructure. Mr. Dell concedes that the '803 Patent is not relevant to smartphones and so any discussion of the value of a smartphone cellular patent portfolio is irrelevant. Ex. 6, Dell Deposition at 67:19-23; 190:24-191:8.

### 5.    Mr. Dell's discussion of 5G networks is irrelevant.

Throughout his report, Mr. Dell makes references to the growth of 5G cellular networks and technology as evidence of the success to the '803 Patent. This is highly prejudicial and unsupported by the evidence. 5G cellular networks are the result of hundreds of companies contributing technology to the 5G standard combined with network carriers' efforts in rolling out that technology. Mr. Dell has done nothing to show that the success of 5G networks is attributable to the '803 Patent.  To the contrary, AT&T's 5G network was rolled out before Daingean asserts AT&T began infringing the '803 Patent.  Mr. Dell's own analysis shows that ▮▮▮▮▮ of AT&T's 5G network uses features accused of infringing the '803 Patent **and** only benefits during ▮▮▮▮▮ of the time **and** the '803 Patent responsible for (at most) ▮▮ of the value. Put together, Mr. Dell's analysis is that the '803 Patent is only relevant to roughly ▮▮ of AT&T's 5G network.

Accordingly, Mr. Dell's discussion of the growth of 5G cellular technology should be excluded because it will only confuse the jury into thinking that the success of AT&T's 5G network is due to the '803 Patent.

## V.    CONCLUSION

For the reasons set forth above, Mr. Dell's damages theory is flawed and must be excluded in its entirety.

Dated: October 17, 2024

Respectfully submitted,

/s/ *Nicholas Mathews*

Nicholas Mathews (Lead Counsel)
Texas State Bar No. 24085457
nmathews@McKoolSmith.com
Warren Lipschitz
Texas State Bar No. 24078867
wlipschitz@mckoolsmith.com
Eric Hansen
TX State Bar No. 24062763
ehansen@mckoolsmith.com
Alexander J. Chern
Texas State Bar No. 24109718
achern@McKoolSmith.com
**MCKOOL SMITH, P.C.**
300 Crescent Court Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Telecopier: (214) 978-4044

Joshua Budwin
Texas State Bar No. 24050347
jbudwin@mckoolsmith.com
Matthew T. Cameron
Texas State Bar No. 24097451
mcameron@McKoolSmith.com
**MCKOOL SMITH, P.C.**
303 Colorado Street, Suite 2100
Austin, TX 78701
Telephone: (512) 692-8752

Jennifer L. Truelove
Texas State Bar No. 24012906
jtruelove@McKoolSmith.com
**MCKOOL SMITH, P.C.**
104 East Houston Street, Suite 300
Marshall, TX 75670
Telephone: (903) 923-9000
Telecopier: (903) 923-9099

Deron R. Dacus
State Bar No. 00790553
ddacus@dacusfirm.com
**THE DACUS FIRM, PC**
821 ESE Loop 323, Suite 430
Tyler, TX 75701

16

Telephone: (903)705-1117
Facsimile: (903) 581-2543

**ATTORNEYS FOR DEFENDANTS
AT&T CORP, AT&T MOBILITY LLC,
AT&T MOBILITY II LLC, AT&T
SERVICES INC, AND T-MOBILE USA,
INC.**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document has been

served on all counsel of record via the Court's ECF system on October 17, 2024.

/s/ *Nicholas Mathews*
Nicholas Mathews

**CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL**

I hereby certify that the foregoing document is authorized to be filed under seal pursuant

to the Protective Order entered in this case.

/s/ *Nicholas Mathews*
Nicholas Mathews

**CERTIFICATE OF CONFERENCE**

I hereby certify that the parties met and conferred regarding the forgoing motion pursuant

to Local Rules CV-7(h) and (i). Plaintiff opposes the motion. Intervenors Ericsson and Nokia do

not oppose the motion.

/s/ *Nicholas Mathews*
Nicholas Mathews

18