IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| DAINGEAN TECHNOLOGIES LTD. | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | CIVIL ACTION NO. 2:23-CV-00123-JRG-RSP |
| v. | § | |
| | § | |
| AT&T CORP., AT&T MOBILITY LLC, AT&T MOBILITY II LLC, and AT&T SERVICES INC. | § | JURY TRIAL DEMANDED |
| | § | |
| | § | |
| *Defendants*, | § | |
| | § | |
| ERICSSON INC. and NOKIA OF AMERICA CORPORATION | § | |
| | § | |
| | § | |
| *Intervenors*. | § | |
| | § | |

**DAINGEAN'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO STRIKE #2: *DAUBERT* MOTION TO EXCLUDE DAMAGES EXPERT OPINIONS OF STEPHEN E. DELL (Dkt. 198)**

**TABLE OF CONTENTS**

I.      INTRODUCTION ......................................................................................................... 1

II.     ARGUMENT .................................................................................................................. 2

        A.      Mr. Dell Properly Apportions Based Upon the Incremental Benefits Afforded by
                the Patented Invention................................................................................................. 2

        B.      Mr. Dell Properly Apportions for Non-Network Benefits...................................... 6

        C.      Mr. Dell Properly Apportions ██████ of AT&T's 5G Data and Voice Revenue
                Generated by the Infringing Portion of AT&T 5G Network. ................................ 6

        D.      Mr. Dell Properly Employs ██████ as Proxy to Adjust for Peak Data Traffic........ 8

        E.      Mr. Dell's Incremental Benefits Damages Model Properly Apportions for the
                Value of Other 5G Technologies. ........................................................................... 10

        F.      Mr. Dell's Profit Division Using AT&T's Published Rate of Return on Invested
                Capital is an Accepted, Reliable Metric. ............................................................... 11

        G.      Defendants Mischaracterize Relevant Information as "Immaterial" to Improperly
                Undermine Mr. Dell's Opinions. ........................................................................... 13

III.    CONCLUSION.............................................................................................................. 15

<u>TABLE OF AUTHORITIES</u>

**Cases**

*Apple Inc. v. Motorola, Inc.*,
  757 F.3d 1286 (Fed. Cir. 2014) ............................................................................ 2

*Apple Inc. v. Motorola, Inc*.,
  757 F.3d 1286 Fed. Cir. 2014) ............................................................................... 6

*Apple v. Samsung Elec. Co., Ltd*.,
  735 F.3d 1352 (Fed. Cir. 2013) ............................................................................. 8

*Arigna Tech. Ltd. v. Nissan Motor Co.., Ltd*.,
  No. 2:22-cv-126, Dkt. 321 (E.D. Tex. Oct. 24, 2022) ........................................... 4

*CliniComp Int'l v. Athenahealth, Inc.,*
  No. 1:18-CV-00425, 2020 WL 13111151 (W.D. Tex. Dec. 14, 2020) ................... 12

*CSIRO v. Cisco Sys.,*
  2014 WL 3805817 (E.D. Tex. 2014) ..................................................................... 4

*Ericsson, Inc. v. D-Link Sys., Inc*.,
  773 F.3d 1201 (Fed. Cir. 2014) ............................................................................. 14

*Finesse Wireless, LLC v. AT&T Mobility, LLC*,
  Case No. 2:21-cv-00316-JRG-RSP, Dkt. 240 (E.D. Tex. Dec. 21, 2022)............... 9

*Finjan, Inc v. Secure Computing Corp.*,
  626 F.3d 1197 (Fed. Cir. 2010) ............................................................................. 12

*Genband US LLC v. Metaswitch Networks Corp*.,
  Case No. 2:14-cv-33-JRG-RSP, 2016 WL 125503 (E.D. Tex. Jan. 9, 2016)............... 3, 10, 14

*i4i Ltd. P'ship v, Microsoft Corp*.,
  958 F.3d 831 (Fed. Cir. 2010), aff'd, 564 U.S. 91 (2011) .................................... 12

*i4i Ltd. P'ship v. Microsoft Corp.*,
  598 F.3d 831 (Fed. Cir. 2010) ............................................................................... 2

*Limelight Networks, Inc v. XO Commc'ns, LLC*,
  No. 3:15–cv–720, 2018 WL 678245 (E.D. Va. Feb. 2, 2018)............................... 12

*Pavo v. Kingston,*
  35 F.4th 1367 (Fed. Cir. 2022) .............................................................................. 4

*Personalized Media Comm'm, LLC v. Apple, Inc*.,
  No. 2:15-cv-01366-JRG-RSP, Dkt. 486 (E.D. Tex. Feb. 19, 2021)....................... 9

*WAPP Tech Ltd. P'ship v. Seattle Spinco, Inc*.,
  No. 4:18-cv-00469-ALM, Dkt. 399 (E.D. Tex. Feb. 8, 2021)................................ 11

*Wireless Alliance, LLC v AT&T Mobility LLC, et al*.,
  No. 2:23-cv-00095-RWS-RSP, Dkt. 245 (E.D. Tex. Oct. 23, 2024)..................... 2, 4

**Statutes**

35 U.S.C. §284..........................................................................................................................4

█████████████████████████████████████████████

## I.       INTRODUCTION

Defendants' motion to exclude the expert opinions of Stephen E. Dell (Dkt. 198) should be denied. Ignoring Mr. Dell's incremental benefits model and **seven** (7) apportionments, Defendants create an irrelevant strawman using an SSPPU that neither Daingean nor Mr. Dell adopt to argue that Mr. Dell based his damages upon "AT&T's entire-market customer revenue." This argument is fundamentally wrong because Dell's analysis **directly** apportions damages to the incremental benefit and value of the patented feature.

With the assistance of Daingean's technical experts, Drs. Feuerstein and Kowalski, Mr. Dell performed a seven-step apportionment. Starting with AT&T's Mobility Segment Revenue, Mr. Dell performs a first apportionment, limiting his analysis to AT&T's cellular data and voice revenue. He then performs a second apportionment, limiting his analysis to revenue attributed to AT&T's 5G network. After removing revenue associated with ███████, he applies a third apportionment to the portions of AT&T's 5G network where the technical experts have indicated the accused functionalities are enabled. From this reduced amount, Mr. Dell applies a fourth apportionment, based on the technical opinion of Dr. Kowalski, that directly accounts for the **incremental benefit** attributed to the '803 Patent (████████████████████████ in AT&T's 5G network). Mr. Dell then applies a fifth reduction, limiting his analysis to ████ of AT&T's 5G network to adjust for urban density/high traffic environments to acknowledge his understanding of where the "peak benefits of the '803 Patent" are realized. Mr. Dell then applies two more apportionments to account for AT&T's net profit margin, which he further reduces based upon the share retained by the hypothetical licensor.

Although Defendants challenge most of these apportionments, these arguments go to the weight of Mr. Dell's opinions and testimony, not admissibility. Where an expert's methodology is

sound, and the evidence relied upon relates sufficiently to the case, "disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010); *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1315 (Fed. Cir. 2014) ("[Q]uestions regarding which facts are most relevant or reliable to calculating a reasonable royalty are for the jury."). Defendants' challenges may be appropriate for cross-examination, but there is no basis for exclusion. Defendants' motion should be denied in its entirety.

## II.    ARGUMENT

### A.    Mr. Dell Properly Apportions Based Upon the Incremental Benefits Afforded by the Patented Invention.

Mr. Dell's damages analysis is not based on "AT&T's entire-market customer revenue," (Dkt. 198 at 3); rather, it is limited to the revenue directly attributed to the cellular services from the ***portion*** of AT&T's 5G network in which the accused functionalities were enabled, further ***apportioned*** to directly account for the "incremental benefit" attributed to the ███████████ ███████████ enabled by the '803 Patent, further ***apportioned*** to account for urban density/high traffic environments in AT&T's 5G network. Ex. 1, Dell Report, ¶25; *Wireless Alliance, LLC v AT&T Mobility LLC, et al.*, No. 2:23-cv-00095-RWS-RSP, Dkt. 245 at 3 (E.D. Tex. Oct. 23, 2024) (EMVR not implicated where expert "conducted multiple … analyses supported by … technical opinions to calculate apportionment factors for incremental value …")

With the assistance of Drs. Feuerstein and Kowalski, Mr. Dell performed a multi-step apportionment. Starting with AT&T's Mobility Segment Revenue (from 2022 to May 31, 2024), he first apportions to only data and voice revenue,[1] Ex. 2, Attach. 4.2, followed by a second

---

[1]  According to AT&T, ████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████
Ex. 2, Attach. 4.2 (citing Ex. 6, Lucas Dep. Tr., at 38:10-20 and 40:21-41:1).

███████████████████████████████████████

apportionment to only 5G data and voice revenue. Ex. 3, Attach. 4. He then removes revenue associated with ████████████████████████████. Ex. 4, Attach. 9.1 (Ericsson) & 9.2 (Nokia). Next, relying on discussions with both technical experts, he performs a third apportionment, limiting to the portions of the network with the accused features enabled, e.g., ██████████████████████. *Id.* (████████████████████████). Then, relying on Dr. Kowalski, he applies a fourth apportionment for the technical contribution of the '803 Patent itself (i.e., ██████████████████). *Id.* Mr. Dell then applies a fifth apportionment based on peak traffic/urban density █████), followed by a sixth adjustment to account for AT&T's net profit margin, which he further reduces (for a seventh reduction) based upon the share of the profit margin retained by the hypothetical licensor (here, ███████). *Id.*; Ex5, Attach. 9. This exercise reduces the actual royalty base (i.e., before reduction based on profit margins) to ████████████████████████████, which is ███ ████████████████████████████████. *See* Ex. 4, Attach. 9.1 & 9.2.

Because Mr. Dell's analysis directly apportions the royalty base to the incremental benefit and value of the patented feature, "it is not necessary for him to identify or rely upon the SSPPU." *See Genband US LLC v. Metaswitch Networks Corp.*, Case No. 2:14-cv-33-JRG-RSP, 2016 WL 125503, at *5 (E.D. Tex. Jan. 9, 2016). Defendants' SSPPU criticisms are wholly inapplicable here. Not only is AT&T's argument regarding the SSPPU misplaced, Defendants repeatedly ignore Mr. Dell's opinion, based upon his discussions with Daingean's technical expert, Dr. Feuerstein, and other contemporaneous evidence produced in this case, that "the appropriate royalty base … consists of the revenues and associated profits attributable to the portion of AT&T's 5G network that benefits from the use of the '803 Patent," which is not limited to "the infrastructure base

███████████████████████

station," as Defendants claim.  *See* Ex. 1, ¶109; *see also id.* ¶¶104-105; Ex. 7, Dell Dep. Tr. at 130:7-23 ("the entirety of the network is what is infringing, and to make the use and the benefit of the '803 patent require more than just the base station."); *see also Wireless Alliance,* Dkt. 245 at 2 (rejecting AT&T's claim that "no carrier would ever pay a royalty based on … carrier subscriber revenue"); *Arigna Tech. Ltd. v. Nissan Motor Co.., Ltd*., No. 2:22-cv-126, Dkt. 321 at 4 (E.D. Tex. Oct. 24, 2022) (rejecting argument that patentee "impermissibly considers the value of the accused product to the customer" which "falls squarely within *Georgia-Pacific* Factor 11"). Even AT&T agrees, arguing that the ███████████████████████." Dkt. 199 at 5. Unsurprisingly, that is because AT&T does not sell base stations; rather, it generates revenue though the fees it charges to its customers for access to its ***cellular network***.

Mr. Dell's royalty base is directly tied to the economic ***benefit*** AT&T receives through its infringement, instead of just limited to costs incurred to obtain infrastructure equipment. *See* Dkt. 198 at 1. Simply incurring costs is not infringement. Section 284 requires damages be "adequate to compensate for the infringement, … for the use made by the invention by the infringer." 35 U.S.C. §284. This requires an analysis of the benefits from the infringement; it is not limited to mere costs. *Pavo v. Kingston,* 35 F.4th 1367, 1379 (Fed. Cir. 2022) (comparing costs for infringing equipment to benefits gained as "compar[ing] apples and oranges"); *CSIRO v. Cisco Sys.,* 2014 WL 3805817, at *11 (E.D. Tex. 2014) ("Basing royalty solely on chip price is like valuing a copyrighted book based only on the costs of the binding, paper, and ink needed to actually produce the physical product. While such a calculation captures the cost of the physical product, it provides no indication of its actual value.").

Defendants' other criticisms have no merit. Defendants' assert that Mr. Dell fails to identify any evidence that the '803 Patent drives demand in AT&T's network—or that he tacitly admits as

████████████████████████████████████████████████████

much—is demonstrably false.[2] *See* Ex. 7 at 34:12-35:16. Dr. Kowalski's technical analysis

quantified the value of the '803 Patent compared to the "next closest alternative," which he found

to be ███████████████████████████████. Ex. 1, ¶286. This higher throughput

enabled by the '803 Patent provides numerous improvements over the prior art, including more

efficient use of available 5G spectrum ████████████████████████ increased

data rates, improved "edge of cell" performance, and interference reduction. *Id*., ¶¶218, 222. And

by comparing the benefit of the '803 Patent to the non-infringing alternative, Mr. Dell further

apportions for the technical benefit of the patent. Ericsson's own documents and testimony confirm

these benefits and Dr. Kowalski's analysis. *Id*., ¶226 (citing Ex. 8 (ERICSSON_00078659

(native), p. 4 ███████████████████████████")); ¶230 (citing Ex. 9

(ERICSSON_00012973, p. 2) ("██████████████████")); ¶231 (citing *id*., p. 20 ("███

██████████████")); ¶234 (citing *id.*, p. 101 ("██████████")); ¶¶238-239 (citing Ex.

10, Faxer Dep. Tr. at 57:9-21 (██████████████████████████████

████████████████████"), 52:22-58:4 ("████████████████████

████████████████████████████████████") and

58:20-59:7 ("[████████████████████████████████

████████████████████████.")).

Defendants claim that "there is no license or industry practice supporting royalties based

on customer revenue." Dkt. 198 at 5. Not so. ██████████████████████

████████████████████████████████████████████████

██████████████████████████ Ex. 1, ¶108 (citing Ex. 11, Delgado Dep. Tr.

---

[2] Nowhere does Mr. Dell admit this and, in fact, the footnote cited by Defendants does not cite Mr. Dell's report or his testimony.

at 57:4-13).

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████[3]

### B.    Mr. Dell Properly Apportions for Non-Network Benefits.

Defendants argue that Mr. Dell failed to apportion customer revenue for other non-network "benefits and services" that they claim are unrelated to "data traffic or voice service." *See* Dkt. 198 at 6. But not only has Mr. Dell already accounted for this in his incremental benefits model, but many of the non-network related features—such as HBO Max, security services and unlimited services in Latin American countries—are included for *free* with certain subscriptions, requiring no further apportionment. *See* Ex. 7 at 55:14-24. But more importantly, customers still use data to utilize these services, even with the option to stream over WiFi. *See id*. at 54:21-55:3. Defendants' assertion that access to these services "have nothing to with 5G," is beside the point because Daingean alleges that the "core network which routes voice, data, and video traffic" *infringes* the '803 Patent. Ex. 1, ¶104-109; Ex. 12, Feuerstein Report, ¶¶46, 48; *see also* Ex. 7 at 130:7-23.

### C.    Mr. Dell Properly Apportions ████████ of AT&T's 5G Data and Voice Revenue Generated by the Infringing Portion of AT&T 5G Network.

Mr. Dell properly relies on the technical opinion of Dr. Kowalski to apportion ████████ of the customer revenue generated by "incremental benefit" attributed to the corresponding increase spectral efficiency enabled by the '803 Patent.[4] *Apple Inc. v. Motorola, Inc*., 757 F.3d 1286, 1321 Fed. Cir. 2014) ("Experts routinely rely upon other experts hired by the party they represent for

---

[3] Nor should Ms. Bennis be heard to offer sweeping opinions about the licensing practices of these entities where no one—including Ms. Bennis—has had access to all of the licenses entered by these parties. *See* Dkt. 198 at 5, fn. 11.

[4] Defendants' criticisms of Dr. Kowalski's opinions regarding the technical benefits of the '803 Patent are also unfounded, which are addressed in Daingean's response to Dkt. 199, filed contemporaneously herewith.

expertise outside of their field."). But before Mr. Dell even applies this technical apportionment, he has already apportioned ***three times*** to limit his analysis to the portion of AT&T's 5G network where the infringing technology is used—5G data/voice where the accused features are enabled (e.g., ███████ ), i.e., ████ of the network.[5] *See* Ex. 7 at 26:13-27:13; 40:15-41:5; 42:20-43:13; 71:21-72:10, 85:10-86:8, 91:21-92:19 and 102:22-103:2.

Defendants' economic criticisms are equally misplaced. AT&T's customers are anything but ambivalent to increased throughput because the very features AT&T concedes are valuable to its customers—such as price, customer service, reliability and network quality—are directly impacted by throughput and spectral efficiency. *See* Dkt. 198 at 7. Increased spectral efficiency provides additional 5G network capacity that AT&T itself has invested over ████████ to acquire. Ex. 1, ¶218. This increased 5G network capacity allows AT&T to provide its subscription service to its customers with fast, reliable and secure coverage, which AT&T advertises to gain subscribers. *Id.*, ¶212 (citing Ex. 13, DAINGEAN_00012260). Increased throughput is directly accretive to AT&T's profits because its customers will not pay for AT&T's services if they cannot get access to AT&T's network. Mr. Dell testified at length about these economic benefits, i.e., "what customers are economically paying for," via increased throughput. Ex. 7 at 117:9-10; *see, generally*, *id.* at 116:15-118:8; *see also id.* at 116:24-25 ("quality of service"), 117:9 ("reliable data"); 117:8-9 ("connectivity to faster speeds, more reliable data"). AT&T itself recognizes this, as it "expect[s] revenue growth in [its] wireless and broadband businesses as customers demand instant connectivity and higher speeds made possible by wireless network enhancements through

---

[5] Even Defendants concede that Mr. Dell did not fail to apportion, arguing that his analysis "███ ████████████████████████████████████████████████ " Dkt. 198 at 15.

████████████████████████████████████████████

5G deployment ….” Ex. 14, DAINGEAN_00011268 at 28 (cited in Ex. 1, ¶51).[6]

Nor does Mr. Dell improperly rely on or include “other” benefits of 5G cellular technology or “other technologies” in his calculations (*see* Dkt. 198 at 7-8) because his incremental benefits model accounts for the benefits the ’803 Patent provides **on top** of AT&T’s 5G network to make the 5G network more efficient. Ex. 1, ¶25. ***First***, because the benefit of the ’803 Patent is directly related to SRS beamforming,[7] Mr. Dell limits his analysis to the portion of AT&T’s 5G network where these accused functionalities are enabled. *See* Ex. 4 (███████████████████████████ ████). ***Second***, Mr. Dell apportions again based on the technical contribution of the ’803 Patent itself.[8] *Id.* (using ███████████████████). ***Third***, Mr. Dell further apportions by ██████ to adjust for urban density/high traffic environments in AT&T’s 5G network where the benefits are realized. *Id.; see also* Ex. 4. These adjustments account for the so-called “combined contributions,” other technologies such as ███████████████████, as well as “generational advances” that AT&T argues Mr. Dell ignores. *See* Dkt. 198 at 8.

### D.    Mr. Dell Properly Employs ██████ as Proxy to Adjust for Peak Data Traffic.

Because Dr. Kowalski’s increased capacity benefits were evaluated in dense urban environments, to limit the damages analysis to the “peak benefits of the ’803 Patent,” Mr. Dell

---

[6] Defendants are also wrong to argue that Mr. Dell was required to conduct or cite “consumer surveys to gauge the value of throughput to customers,” Dkt. 198 at 7, as the Federal Circuit recognizes “a variety of ways” to show “some connection between the patented feature and demand for [the accused products].” *Apple v. Samsung Elec. Co., Ltd.*, 735 F.3d 1352, 1364 (Fed. Cir. 2013). For example, “it might be shown with evidence that the inclusion of a patented feature makes a product significantly more desirable,” as increased throughput provides here. *See id.*

[7] Mr. Dell’s opinion is based upon his discussions with Dr. Feuerstein, who opines that “the Accused Instrumentalities include 5G base station systems, and this includes the portions of AT&T’s 5G cellular network in which there is at least one base station that implemented support for ***SRS reciprocity-based downlink beamforming algorithms***.” Ex. 1, ¶104 (emphasis added).

[8] Relying on Dr. Kowalski, “███████████████████████████████████████████ ███████████████████ ...” Ex. 1, ¶224.

further apportioned using National Highway Traffic Safety Administration ("NHTSA") "rush hour" data as a proxy for peak cellular traffic environments. Ex. 1, ¶¶288-289. Peak cellular traffic occurs in busy urban centers (e.g., Manhattan during the workday) or along busy traffic corridors (e.g., freeway at rush hour).  *See* Ex. 7 at 94:12-19 and 95:19-96:7. His ███ apportionment was based upon the number of hours in a 7-day week the NHTSA defines as "rush hour" (25 hours per 168-hour week, based upon 5-hours per work day). Ex. 1, ¶289.

Defendants criticize this apportionment step as unreliable because it is based upon automobile traffic, as opposed to actual peak data from AT&T's network. Dkt. 198 at 8-9. To the extent such AT&T data exists, AT&T never produced it. *Finesse Wireless, LLC v. AT&T Mobility, LLC*, Case No. 2:21-cv-00316-JRG-RSP, Dkt. 240 at 1-16 (E.D. Tex. Dec. 21, 2022) (permitting use of proxy where other data unavailable). Without sufficient data for Mr. Dell to evaluate and rely upon, he used data from a reliable source (i.e., the NHTSA, which is a department of U.S. Department of Safety) to reasonably estimate population movement in urban dense/high traffic environments. *Personalized Media Comm'm, LLC v. Apple, Inc*., No. 2:15-cv-01366-JRG-RSP, Dkt. 486 at 9-11 (E.D. Tex. Feb. 19, 2021) (admitting opinion relaying on head count information as a "reasonable proxy" to apportion the accused functionality).

Mr. Dell further confirmed that his ███ apportionment metric was reasonable by comparing it to publicly available documents on Ericsson's own website ("dense urban uplink traffic is around 14 percent of total traffic"). Ex. 1, ¶¶289, fn. 414 (citing Ex. 15, DAINGEAN_00012352). Ignoring the cited article and misinterpreting Mr. Dell's quotation, Defendants summarily dismiss this evidence (***from*** Ericsson), arguing that it has "nothing to do with peak data traffic." Dkt. 198 at 9. But the metric expressly relates to "peak data traffic," as Ex. 15 shows:

███████████████████████████████████████

- ▪ "This shows how the combination of population density and **peak usage per user** is important when considering network capacity requirements."

- ▪ "Network deployment comprises both coverage and capacity sites. Coverage sites provide basic geographical coverage while capacity sites add extra capacity where coverage is good and there is a **high density of subscribers**. To achieve optimum 5G performance, both coverage and capacity must be available throughout the network."

*Id*. Hence, Defendants' criticism is unfounded, or at a minimum, a dispute for the jury to resolve.

*Micro Chem., Inc. v. Lextron, Inc*., 317 F.3d 1387, 1391-92 (Fed. Cir. 2003) ("When … the parties' experts rely on conflicting set of facts, it is not the role of the trial court to evaluate the correctness of those facts.").

E.    **Mr. Dell's Incremental Benefits Damages Model Properly Apportions for the Value of Other 5G Technologies.**

Like a broken record, Defendants argue (again) that Mr. Dell has failed to apportion for

"████████████████████████████████████████████

████████████████████████████████████████. Dkt.

198 at 9. This argument is fatally flawed because it ignores three, separate apportionments applied by Mr. Dell after limiting to 5G data and voice revenue: (i) portions of the network with the accused features enabled; (ii) technical contribution of the '803 Patent itself; and (iii) peak traffic/urban density. It is unclear why Defendants refer to the 5G Standard where no party contends that the '803 Patent is standard essential,[9] but for "other patents … used by AT&T in the Accused Products that have not been declared essential," there has been no analysis provided by AT&T or its experts showing which—if any—are relevant to Mr. Dell's damages analysis. *See Genband*, 2016 WL 125503, at *4 ("It is within the purview of a qualified expert to determine which evidence should be afforded significant weight."). Indeed, relevant documents cited by Mr.

---

[9] It is also unclear how Ms. Bennis is qualified to offer an opinion regarding the "number of essential patents," since Ms. Bennis is not a technical expert, rendering such opinions regarding essentiality unreliable.

Dell show subscription plans and the overall increase in the smartphone market are due to higher download speeds, new network functionalities and improved 5G network coverage and capacity. Ex. 1, ¶¶204-219.

> **F.   Mr. Dell's Profit Division Using AT&T's Published Rate of Return on Invested Capital is an Accepted, Reliable Metric.**

Mr. Dell opines that in a hypothetical negotiation, AT&T would have accepted its return on invested capital ("ROIC")[10] and given the remaining apportioned incremental profits to the licensor (at the time, ███████. Ex. 1, ¶292. Because Mr. Dell opines that the hypothetical negotiation took place in ████████, he uses AT&T's overall average ROIC of ███████. *Id*., ¶¶121, 292. Defendants criticize Mr. Dell's profit division, arguing that it is "speculative and unconnected to the facts of the case," akin to an impermissible "rule of thumb." *See* Dkt. 198 at 10. But this precise argument was rejected in *WAPP Tech Ltd. P'ship v. Seattle Spinco, Inc*., No. 4:18-cv-00469-ALM, Dkt. 399, at 10-11 (E.D. Tex. Feb. 8, 2021).[11] There, the court found the use of ROIC to be sufficiently tied to the facts of the case, as "a financial calculation that fluctuates and is therefore a different figure for each defendant at any given timepoint," as is the case here with AT&T. *See id*. at 10. The court held that it was "rational to opine that [the licensee] … would agree to their customary rate of return when they make investments of capital in technology or otherwise." *Id*. at 10-11. The court was unpersuaded by arguments that the ROIC approach was a "rule of thumb," like the 25% rule, "which are default negotiation positions applicable to any individual negotiation." *Id*. at 10. Moreover, the court observed that "the Federal Circuit has

---

[10] As Mr. Dell explains in his opening report, ROIC is a profitability or performance ratio that measures how much investors are earning on capital invested. Ex. 1, ¶ 292. It fluctuates based on the net operating profit after taxes, and the amount of invested capital. *Id*.

[11] Judge Mazzant's order from the *WAPP* case was initially filed under seal, but a redacted version was subsequently published as an exhibit to another pleading in that case, which is attached hereto as Ex. 16.

████████████████████████████████

upheld profit splits based on custom in the industry and history of prior licenses, both of which seem analogous to ROIC, which is a customary rate of return on investments." *Id*. at 11 (citing *Finjan, Inc v. Secure Computing Corp.*, 626 F.3d 1197, 1210 (Fed. Cir. 2010)). At bottom, the court found the criticisms of ROIC "to go to the weight of [the expert's] testimony, not admissibility." *Id*. (*citing i4i Ltd. P'ship v. Microsoft Corp*., 958 F.3d 831, 852 (Fed. Cir. 2010), aff'd, 564 U.S. 91 (2011)). This court should reach the same conclusion here.

Defendants also misrepresent how Mr. Dell applies the ███ ROIC metric. *See* Dkt. 198 at 10. He does not conclude that AT&T would agree to "receive only ███ of available profit … based on ROIC;" rather, he uses it as an economic benefit split of the *incremental* profits. Ex. 1, ¶¶26, 292-293, 322-323; *see also* Ex. 7 at 148:18-149:20, 160:13-161:12. Defendants are also wrong to argue that ROIC, as a company-wide metric, is somehow unreliable, especially where AT&T Mobility constitutes "a substantial portion of AT&T's business" that "aligns with the overall performance of … AT&T's business." *Id*. at 167:1-17. And, ███████████████████
███████████████████████████████████████████████████████████
███████████████████. *See* Dkt. 198 at 11.

Finally, Defendants cite a pair of out-of-district cases that do not even address ROIC.[12] In *CliniComp Int'l v. Athenahealth*, *Inc*., the excluded opinion assumed an entire 10-percent increase in revenue was due to the infringing feature, which the evidence did not support. No. 1:18-CV-00425, 2020 WL 13111151, at *4 (W.D. Tex. Dec. 14, 2020). Here, the *incremental* profits have already been apportioned to the infringing feature to the portion of AT&T's 5G network where the benefits are realized. *See* Ex. 1, ¶292.

---

[12] In *Limelight Networks, Inc v. XO Commc'ns, LLC*, the court excluded the "allocation of incremental revenues based on defendant's *weighted average costs of capital*," not ROIC. No. 3:15–cv–720, 2018 WL 678245, at *3 (E.D. Va. Feb. 2, 2018).

### G.    Defendants Mischaracterize Relevant Information as "Immaterial" to Improperly Undermine Mr. Dell's Opinions.

Ignoring Mr. Dell's incremental benefits damages model and the *Georgia-Pacific* reasonable royalty framework itself, Defendants seek to exclude significant portions of Mr. Dell's opinion—and the evidence upon which he relies—under the false pretense that the information is somehow "immaterial" and therefore "wholly unrelated to his purported analysis." Dkt. 198 at 12. As explained below, Defendants are incorrect.

**AT&T's Cumulative Revenue and Profits**. Defendants claim that AT&T financials, including its "revenue, profits, and income margins," should be excluded as "improper for use as a royalty base." Dkt. 198 at 12. As explained above, all of these financials are directly tied to the Accused Products (i.e., AT&T network and cellular services), making them relevant to Mr. Dell's opinion. In short, this argument is another collateral attack on Mr. Dell's incremental benefits damages model, which should be rejected for the reasons set forth above.

**AT&T's Spectrum Costs**. Next, Defendants argue that AT&T's recent acquisition of additional 5G spectrum is somehow irrelevant to Mr. Dell's damages opinion, an opinion based upon the benefits of increased ***spectral efficiency*** obtained through use of the '803 Patent. Ex. 1, ¶218. This cannot be correct. First, Mr. Dell directly relies on Dr. Kowalski's technical opinion that the '803 Patent provides more efficient use of available spectrum. *Id*., ¶224. Indeed, the '803 Patent allows AT&T to make more efficient use of its spectrum and serve more customers, therefore, making it more profitable. And, AT&T and Intervenors' produced documents—as well as publicly available documents—unquestionably show the importance of 5G to the success of AT&T's cellular network. *See id.,* ¶¶51-55 and 208-209. In short, AT&T's spectrum costs are not "immaterial," but instead are directly relevant to damages.

**Reliance on Ericsson and Nokia Licenses.** Defendants complain that Mr. Dell improperly

█████████████████████████████████████

relies on certain Nokia and Ericsson patent licenses as "directional evidence." *See* Dkt. 198 at 13-14. But relying on Dr. Kowalski's technical comparability opinions, Mr. Dell relies on the Ericsson licenses, under *Georgia-Pacific* Factor 12, because they provide "a range of reasonable royalty rates and/or royalty payments for patents relevant to cellular technologies that include patents considered to be comparable to the '803 Patent." Ex. 1, ¶¶281 and 249-257. The licenses also evidence ████████████████████████, as confirmed by testimony from Ericsson and Nokia. *Id*., ¶249 (citing Ex. 11 at 24:5-25:2 and 25:20-26:5) and ¶258 (citing Ex. 17, Nokia's Patel Dep. Tr. at 26:2-14 and 28:5-22).

**Reliance on Ericsson Presentations.** Defendants also seek to exclude two Ericsson presentations, ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████ Mr. Dell relies on both under *Georgia-Pacific* Factor 12 as "████████████████████████████████████████

███████████████ Ex. 1, ¶282. ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████. Dkt. 198 at 14-15. Not only is there no such requirement, but it is within Mr. Dell's purview to determine "which evidence should be afforded significant weight, so long as he applies reliable principles and methods in making this determination." *See Genband*, 2016 WL 125503, at *4; *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014) ("that a license is not

██████████████████████████████████████████

perfectly analogous generally goes to the weight of the evidence, not its admissibility.").

Defendants also misrepresent Mr. Dell's deposition testimony to claim that he has somehow

conceded that ████████████████████    █████████████████████████████████████

██████████    Dkt. 198 at 15. Not only does the cited testimony not support such a conclusion

(much less any concession),[13] but elsewhere Mr. Dell testified to the opposite, i.e., "██

█████████████████████████████████████████." Ex. 7 at 228:8-13; *see also* Ex. 1, ¶100

("…████████████████████████████████████████…").

**Growth of 5G Networks.** Finally, Defendants seek to prevent Mr. Dell from opining that

the growth and success of AT&T's 5G network is attributable to the '803 Patent. *See* Dkt. 198 at

15. But as explained above, increased spectral efficiency offers AT&T (and its customers) more

efficient use of available 5G spectrum, increased data rates, improved "edge of cell" performance,

and interference reduction. Ex. 1, ¶¶218, 222, 226, 230, 231, 234, and 238-239. And, this improved

capacity is directly tied to the increased revenue AT&T receives from its customers for access to

its cellular network, as AT&T touts in its most recent 10-K SEC filing: AT&T "expect[s] revenue

growth in [its] wireless and broadband businesses as customers demand instant connectivity and

higher speeds made possible by wireless network enhancements through 5G deployment …." Ex.

14 at 28 (cited in Ex. 1, ¶51); *see also* Ex. 1, ¶¶51-55 and 208-209.

III.    **CONCLUSION**

The Court should deny Defendants' *Daubert* motion to exclude the damages expert

opinions of Stephen Dell.

---

[13] With respect to the first cite, in responding to a question regarding Mr. Dell's use of "5G data and voice revenue only," Mr. Dell testified that "the '803 patent … is used in the 5G network, and in particularly on the ████████████████████████████████████████████████ Ex. 7 at 67:19-23.  The second cite related to a question about a low-dollar Daingean license where Daingean had not asserted that the licensee had infringed the '803 Patent. *Id*. at 190:24-191:8.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Dated:  October 31, 2024

Respectfully submitted,

*/s/  Amir H. Alavi*
Amir H. Alavi
Texas Bar No. 00793239
aalavi@aatriallaw.com
Demetrios Anaipakos
Texas Bar No. 00793258
danaipakos@aatriallaw.com
Michael McBride
Texas Bar No. 24065700
mmcbride@aatriallaw.com
Scott W. Clark
Texas Bar No. 24007003
sclark@aatriallaw.com
Connie Flores Jones
Texas Bar No. 00793736
cfloresjones@aatriallaw.com
Masood Anjom
Texas Bar No. 24055107
manjom@aatriallaw.com
C. Ryan Pinckney
Texas Bar No. 24067819
rpinckney@aatriallaw.com
ALAVI & ANAIPAKOS PLLC
609 Main Street, Suite 3200
Houston, Texas 77002
Telephone: (713) 751-2362
Facsimile:  (713) 751-2341

Michael Heim
Texas Bar No. 09380923
mheim@hpcllp.com
Eric Enger
Texas Bar No. 24045833
eenger@hpcllp.com
R. Allan Bullwinkel
Texas Bar No. 24064327
abullwinkel@hpcllp.com
Alden Harris
Texas Bar No. 24083138
aharris@hpcllp.com
Blaine Larson
Texas Bar No. 24083360
blarson@hpcllp.com
Michael B. Dunbar

Texas Bar No. 24125213
mdunbar@hpcllp.com
HEIM PAYNE & CHORUSH LLP
609 Main Street, Suite 3200
Houston, Texas 77002
Telephone: (713) 221-2000
Facsimile:  (713) 221-2021

Andrea L. Fair
Texas Bar No. 24078488
andrea@millerfairhenry.com
Charles Everingham IV
Texas Bar No. 00787447
chad@millerfairhenry.com
MILLER FAIR HENRY PLLC
1507 Bill Owens Pkwy
Longview, Texas 75604
Telephone: (903) 757-6400
Facsimile:  (903) 757-2323

*Counsel for Plaintiff Daingean Technologies Ltd.*

## CERTIFICATE OF SERVICE

Pursuant to the Federal Rules of Civil Procedure and Local Rule CV-5, I hereby certify that, on October 31, 2024, a copy of the foregoing was served electronically through the U.S. District Court, Eastern District of Texas ECF system to all counsel of record whom are Filing Users of the Court's Electronic Filing System.

*/s/ Amir H. Alavi*
Amir H. Alavi