IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

DAINGEAN TECHNOLOGIES, LTD.,    (  CAUSE NO. 2:23-CV-123-JRG
                                )
            Plaintiff,          (
                                )
vs.                             (
                                )
AT&T CORP., et al.,             (  MARSHALL, TEXAS
                                )  SEPTEMBER 11, 2025
            Defendants.         )  8:00 A.M.
_____


                            VOLUME 5


_____

                      TRIAL ON THE MERITS

            BEFORE THE HONORABLE RODNEY GILSTRAP
            UNITED STATES CHIEF DISTRICT JUDGE
                       and a jury
_____


                  SHAWN McROBERTS, RMR, CRR
                   100 E. HOUSTON STREET
                  MARSHALL, TEXAS  75670
                     (903) 923-8546
              shawn_mcroberts@txed.uscourts.gov

A P P E A R A N C E S

FOR THE PLAINTIFF:    ALAVI & ANAIPAKOS, PLLC
                      609 MAIN STREET, SUITE 3200
                      HOUSTON, TEXAS  77002
                      (713) 751-2363
                      BY:  MR. AMIR ALAVI
                           MR. DEMETRIOS ANAIPAKOS
                           MR. SCOTT CLARK
                           MR. MASOOD ANJOM

                      HEIM, PAYNE & CHORUSH, LLP
                      609 MAIN ST., SUITE 3200
                      STE 2100
                      HOUSTON, TEXAS  77002
                      (713) 221-2000
                      BY:  MR. BLAINE LARSON
                           MR. ROBERT BULLWINKEL

                      MILLER FAIR HENRY, PLLC
                      1507 BILL OWENS PARKWAY
                      LONGVIEW, TEXAS  75604
                      (903) 757-6400
                      BY:  MS. ANDREA FAIR
                           MR. GARRETT PARISH

FOR THE DEFENDANTS:   MCKOOL SMITH, PC - DALLAS
                      300 CRESCENT COURT, SUITE 1500
                      DALLAS, TEXAS  75201
                      (214)  978-4000
                      BY:  MR. WARREN LIPSCHITZ
                           MR. NICHOLAS MATHEWS
                           MR. ALEXANDER CHERN
                           MS. CLARE CHURCHMAN

                      MCKOOL SMITH - AUSTIN
                      303 COLORADO STREET, STE. 2100
                      AUSTIN, TEXAS  78701
                      (512) 692-8722
                      BY:  MR. CHARLES FOWLER

                      MCKOOL SMITH, P.C. - MARSHALL
                      104 EAST HOUSTON ST., STE. 300
                      MARSHALL, TEXAS  75670
                      (903) 923-9000
                      BY:  MS. JENNIFER TRUELOVE

THE COURT:  Be seated, please.

Counsel, after the close of the evidence yesterday, the Court took up and heard motions from each of the parties regarding practice under Rule 50(a) of the Federal Rules of Civil Procedure.  Having considered those motions and heard the appropriate arguments, the Court ruled on each of those matters.

After the Court completed Rule 50(a) practice, the Court held an informal charge conference with counsel in chambers where the Court and counsel had an open and free-flowing discussion off the record regarding the most current proposed final jury instruction and verdict form then existing.  The Court heard from each of the parties on various issues, not only where the parties were in disagreement, but various other places within those documents where the Court had questions.

And after a fulsome discussion informally, the Court adjourned the informal charge conference, the Court considered carefully the input from all the parties obtained through that informal charge conference, and taking that into account, the Court, working with the most current iteration of the final jury instructions and verdict form, overnight generated what it believes to be the proper and appropriate final jury instruction and verdict form for submission to this jury in this case.

The Court has furnished those documents to counsel for

the opposing parties, providing then ample opportunity to review the same, and the Court's now prepared to undertake a formal charge conference where either party may lodge such objections to both the charge and the verdict form as they believe the facts, the law, and the interests of their clients so require.

With that, counsel, as you may be aware, my typical practice is to ask a single spokesperson from each side, one from Plaintiff, one from Defendants and Intervenors, to stand at the podium together. We will go through each of these documents beginning with the final jury instructions on a page-by-page basis. And anywhere along that way if you have an objection to lodge either as to something that has been included or something that's been omitted, the Court will hear and rule on your objections.

And by going through each on a page-by-page basis, the Court believes it minimizes any possibility of overlooking any issue that counsel believes should be raised as a part of this formal charge conference.

Once we've done that with the final jury instructions, we'll follow the same approach with the verdict form. After the verdict form has been reviewed and any objections have been heard and ruled on, that will complete the formal charge conference.

So whoever's going to speak on behalf of Plaintiff,

whoever's going to speak on behalf of Defendant and Intervenor, please go to the podium at this time. And for the record, we have Mr. Larson on behalf of Plaintiff and Mr. Fowler on behalf of Defendant and Intervenor.

All right. We'll proceed in the way I've described. We'll begin with the final jury instructions. We'll turn our attention to the cover page or page 1. Is there any objection here from either party?

MR. LARSON: Not from the Plaintiff.

MR. FOWLER: Not for Defendant.

THE COURT: Turning then to page 2 of the final jury instructions, are there any objections here from either party?

MR. LARSON: Not from the Plaintiff.

MR. FOWLER: Nothing for Defendants.

THE COURT: Turning to page 3, are there any objections?

MR. LARSON: Not from the Plaintiff.

MR. FOWLER: Not for Defendants.

THE COURT: Next is page 4. Are there any objections?

MR. LARSON: Not from the Plaintiff.

MR. FOWLER: Not for Defendants.

THE COURT: Next is page 5. Are there any objections?

MR. LARSON: Not from the Plaintiff.

MR. FOWLER:  Not for Defendants.

THE COURT:  Turning then to page 6, are there any objections here?

MR. LARSON:  Not from the Plaintiff.

MR. FOWLER:  Not for Defendants.

THE COURT:  Turning to page 7, are there any objections here?

MR. LARSON:  Not from the Plaintiff.

MR. FOWLER:  Not for Defendants.

THE COURT:  Turning then to page 8, are there any objections here?

MR. LARSON:  Not from the Plaintiff.

MR. FOWLER:  Not for Defendants.

THE COURT:  Next, counsel, is page 9.  Are there any objections here?

MR. LARSON:  Not from the Plaintiff.

MR. FOWLER:  Not for Defendants.

THE COURT:  Next is page 10.  Are there any objections here?

MR. LARSON:  Not from the Plaintiff.

MR. FOWLER:  Not for Defendants.

THE COURT:  Next is page 11.  Are there any objections here?

MR. LARSON:  Not from the Plaintiff.

MR. FOWLER:  Not for Defendants.

THE COURT: Next is page 12. Are there any objections here?

MR. LARSON: Yes, Your Honor. We object to the sentence that begins, To infringe a claim that recites capability and not actual operation if an accused device is readily configurable to operate in the described mode, it may be found to infringe even if it may also be capable of non-infringing modes of operation.

We don't think that's an accurate statement of law, Your Honor. That case that that readily configurable language comes from is factually -- the *Provizur* case is factually distinguishable from the facts of this case because that case requires multiple physical modifications to a product in addition to a software license; whereas, this case the testimony is that it just requires a software license to activate the accused feature.

THE COURT: All right. That objection is overruled. Is there anything further from either party on page 12?

MR. LARSON: Not from the Plaintiff, Your Honor.

MR. FOWLER: Not for defendants.

THE COURT: All right. Then let's turn to page 13 of the final jury instructions. Are there any objections here?

MR. LARSON: Not from the Plaintiff, Your Honor.

MR. FOWLER: Not for Defendants.

THE COURT:  Turning to page 14, are there any objections here?

MR. LARSON:  Your Honor, we object -- the Plaintiff objects to any instruction on the issue of validity because validity should not be presented to the jury in light of collateral estoppel based on the T-Mobile trial.

THE COURT:  All right.  That objection is overruled. Anything further from either party on page 14?

MR. LARSON:  No, Your Honor.

MR. FOWLER:  Nothing for Defendants.

THE COURT:  Turn then to page 15.  Are there any objections here, counsel?

MR. LARSON:  Nothing from the Defendants.

MR. FOWLER:  Nothing for Defendants.

THE COURT:  Turning then to page 16, are there any objections here?

MR. LARSON:  Yes, Your Honor.  The Plaintiffs object to the final paragraph of page 16.  We believe the jury should be instructed that for the purposes of enablement, the specification includes the originally filed claims.  That was an issue that was in dispute in this case, and that was also an issue -- that was an instruction that was agreed to by the parties up until yesterday afternoon.

THE COURT:  All right.  That objection's overruled. Assuming there's nothing else on page 16, let's turn to page

1256

17.  Are there any objections here?

MR. LARSON:  Not from the Plaintiff, Your Honor.

MR. FOWLER:  Nothing for Defendants.

THE COURT:  Next then is page 18.  Are there any objections here, counsel?

MR. LARSON:  Not from the Plaintiff.

MR. FOWLER:  Not for Defendants.

THE COURT:  Turning then to page 19, are there any objections here?

MR. LARSON:  Not from the Plaintiff.

MR. FOWLER:  Not for Defendants.

THE COURT:  Next is page 20.  Any objections here?

MR. LARSON:  Not from the Plaintiff, Your Honor.

MR. FOWLER:  Not for Defendants.

THE COURT:  Next is page 21.  Any objections here?

MR. LARSON:  Not from the Plaintiff.

MR. FOWLER:  Not for Defendants.

THE COURT:  Counsel, I'll note that all of page 21 and the first half of page 22 are various *Georgia-Pacific* factors.  All 15 factors are not included, but the parties seem to be in agreement that these factors sequentially numbered are the appropriate *Georgia-Pacific* factors to charge this jury on this case.

Do you both agree that's proper?

MR. LARSON:  Plaintiffs agree.

MR. FOWLER: Yes, Your Honor, all Defendants agree.

THE COURT: Are there any objections on page 21?

MR. LARSON: Not from the Plaintiff.

MR. FOWLER: Not for Defendants.

THE COURT: All right. Any objections on page 22?

MR. LARSON: Not from the Plaintiff.

MR. FOWLER: Not for Defendants.

THE COURT: Turning then to page 23, are there any objections here from either party?

MR. LARSON: Not from the Plaintiff.

MR. FOWLER: Not from Defendants.

THE COURT: Next is page 24. Are there any objections here?

MR. LARSON: Not from the Plaintiffs.

MR. FOWLER: Not for Defendants.

THE COURT: Next is page 25. Any objections here?

MR. LARSON: Not from the Plaintiff.

MR. FOWLER: Not for Defendants.

THE COURT: Next is page 26. Are there any objections here?

MR. LARSON: Not from the Plaintiff.

MR. FOWLER: Not for Defendants.

THE COURT: Next is page 27 which is the final page of the charge or the Court's final jury instructions. Are there any objections here?

MR. LARSON:  Not from the Plaintiff.

MR. FOWLER:  Not for Defendants.

THE COURT:  All right, counsel.  Let's turn then to the verdict form.  We'll follow the same approach.

Looking at the cover sheet or page 1 of the verdict form, are there any objections here from either party?

MR. LARSON:  Not from the Plaintiff.

MR. FOWLER:  Not for Defendants.

THE COURT:  Turning then to page 2, which contains various definitions, are there any objections here from either party?

MR. LARSON:  Not from the Plaintiff.

MR. FOWLER:  Not for Defendants.

THE COURT:  Turning to page 3 where there are additional instructions to the jury, are there any objections here?

MR. LARSON:  Not from the Plaintiff.

MR. FOWLER:  Not for Defendants.

THE COURT:  Turning then to page 4 of the verdict form where Question 1 is found, are there objections here?

MR. LARSON:  Not from the Plaintiff.

MR. FOWLER:  Two objections for Defendants, Your Honor.

THE COURT:  State your objections, counsel.

MR. FOWLER:  First, Defendants object to the absence

of separate lines for the interference sensing feature, the RAIT feature, and the RAT feature as proposed by Defendants at Docket 562-2.

And, second, Your Honor, Defendants object to the conditional language on page 4 indicating that the jury should only proceed to the invalidity question if they answer yes to the infringement question.  Defendants object to that language and propose that the jury be given an unconditional invalidity question that they would reach regardless of their answer on infringement.

THE COURT:  All right.  Those objections are overruled.  The Court will note that the Defendant -- neither the Defendant nor Intervenor have lodged any affirmative counterclaims against the Plaintiff that the invalidity theories raised on the Defendants' side of the case are presented only as affirmative defenses and not counterclaims.

Therefore, the Court believes that the invalidity question should be conditional and not unconditional.  But both objections are overruled.

We'll turn then to page 5 of the verdict form where Question 2 is found.  Are there any objections here?

MR. LARSON:  Yes, Your Honor.  We object to Question 2 being presented to the jury because the issue of invalidity should not be presented based on collateral estoppel from the T-Mobile trial.

1260

THE COURT:  All right.  That objection is overruled. Anything from Defendant on page 5?

MR. FOWLER:  Nothing for Defendants, Your Honor.

THE COURT:  Turning then to page 6 where Question 3 is found, are there any objections here from either party?

MR. LARSON:  Not from the Plaintiff.

MR. FOWLER:  Nothing for Defendants.

THE COURT:  Turning then to page 7, which is the final page of the verdict form, are there any objections here, counsel?

MR. LARSON:  Not from the Plaintiff.

MR. FOWLER:  Not for Defendants, Your Honor.

THE COURT:  All right, counsel.  Thank you.  That completes the formal charge conference.

As I've indicated to you previously, the Court will now proceed to print eight hard copies of the final jury instructions so that each member of the jury will be able to have in the jury room their own copy of these final jury instructions after I give them to them orally in open court and on the record.

The jury is due to be here at 8:30.  It's 16 minutes after 8:00.  That should give me just enough time to get that printing done.  My intention is to recess, complete that task, and then at or about 8:30 when all the jury is here, return to the bench and proceed to give the jury the Court's final

instructions on the law followed by closing arguments from counsel.

Before I recess, let me ask, because there was some uncertainty yesterday when I inquired after the close of the evidence, who should I anticipate is going to present closing arguments for the Plaintiff?

MR. ALAVI: Your Honor, Mr. Anaipakos will give closing arguments.

THE COURT: All right. And who should I anticipate will give closing arguments for the Defendant and Intervenor?

MR. DACUS: With the Court's permission, I'll do the full thing.

THE COURT: All right. That's helpful. Thank you, counsel. Court stands in recess.

MR. MATHEWS: Your Honor, may we take up one other item?

THE COURT: Well, then have a seat. What do you have, Mr. Mathews?

MR. MATHEWS: Apologies, Your Honor. I know we're short on time.

I wanted to raise two issues in advance of closings to avoid any objections and disruptions during Plaintiff's closing arguments.

So one thing that we tried to do with the other side was confirm a couple of representations that happened during

trial.  Most notably, during Mr. Padian's testimony, he briefly mentioned that there was a patent transfer discussion between him and Ericsson recently that had never been disclosed to us and it came out during the testimony.  Mr. Alavi said that that was the end of it and it wouldn't be gone into any further.

I sought to confirm that this morning, and there was really no commitment either way.  And so I wanted to raise that issue for us because we view that as significantly prejudicial, irrelevant, and we really don't want to object during their closing.  So that's one item.

THE COURT:  All right.  Let's take whatever you have on your list one at a time.

Mr. Alavi, can you represent to the Court whether Plaintiff's counsel intends to raise that as a part of its closing arguments?

MR. ALAVI:  Your Honor, we may.  This case has been tried by the Defendants attacking Mr. Padian and his business model.  That question was asked, there was no objection, it was answered, and I told the Court we wouldn't go into it any further during the evidence.

But there is no disclosure issue here.  They are trying to make it a discovery issue.  These aren't documents.  These are discussions with Ericsson.  I mean, it's not like it was a discussion with a third party.  But Mr. Dacus -- and I don't

1263

mean to call out Mr. Dacus.  AT&T and Ericsson have tried this case attacking the business model.  We expect we'll hear a little bit of that during closing.  We don't expect it will cross the line, but we're entitled to rebut that in closing during closing argument because the jury's heard all this evidence about how terrible Mr. Padian's business is.  So we intend to be able to talk about it if it's necessary as part of the closing very briefly.

But the answer is, I mean, I think you can understand what the argument is.  They're attacking Mr. Padian, they are saying this has to stop, that his business model isn't good, and if they thought that, why did Ericsson reach out to him to try to sell him some patents?  I think it's fair game.

THE COURT:  All right.  Well, I'm not going to prejudge the argument.  If there are objections raised based on the rules of procedure and evidence, I'll address those at the time.

I think, Mr. Mathews, you probably have an answer to your question.

MR. MATHEWS:  Yes, Your Honor.

THE COURT:  Do you have anything else to raise with the Court?

MR. MATHEWS:  Yes.  One further, Your Honor, and this absolutely falls in the realm of the discovery disputes that we think will be covered by a MIL.

So during the case there's been suggestion several times that Ericsson did not show interference sensing source code to the jury, and the suggestion has been that we are somehow hiding that code or that they haven't been aware of it.

The fact of the matter is they've known about the code all along, they moved to obtain the code, and they were found to be not diligent in obtaining the code.  That ruling came down twice from Judge Payne.  And so we think it would be very inappropriate during closing arguments for the Plaintiff to suggest a discovery dispute that they lost as somehow our fault in terms of what we did or didn't show the jury, particularly to suggest that will we're hiding evidence.  So that's the other concern, Your Honor.

THE COURT:  Do you have a response to that, Mr. Alavi?

MR. ALAVI:  Yes, Your Honor.  First of all, I don't think any discussion about whether or not Ericsson has proved that EIS is disabled violates any MIL.  They have on I think three occasions --

THE COURT:  The question, counsel, is, does your side intend to argue in closing that there's been a lack of disclosure of source code and indicate one way or the other any fault, harm, or prejudice as a result of that.

MR. ALAVI:  No, Your Honor.

THE COURT:  Because that would violate a limine

order as raising a discovery dispute before the jury.

MR. ALAVI:  No, Your Honor, we are not.  But I want to preview for the Court because if you have guidance, we want to make sure we follow it.

We are going to say that you heard from Ericsson that they disabled the code.  They haven't shown you any evidence of that.  They haven't shown you any documents.  They haven't shown you any source code.  They could have.  They chose not to.  And you have to take their word for it.

And we think that's appropriate argument.  It doesn't raise a discovery dispute because regardless of the discovery dispute, if they wanted to produce -- show the jury the code, they could have produced it and they could have shown it.  They chose not to.  They just chose to rely on Mr. Faxér's testimony.  We think it's fair game to say that they didn't show you any documentary evidence to support what Mr. Faxér said.

THE COURT:  All right.  Well, it's the Court's view that arguing that they've told you they disabled the code but they haven't shown you anything to prove it, that is permissible.  But saying they haven't shown you any source code, a specific mention of a lack of source code I think raises the discovery dispute and violates the limine order.

So as long as it's any documentation or any evidence or at a high level, but I do think it's improper for you to argue

they have not shown you any source code, given the facts about how that code was handled and ultimately resolved as a part of the pretrial and discovery process.

MR. ALAVI:  Now, Your Honor, it's part of the evidentiary record.  It was asked without objection several times that you haven't shown any source code.  So at that point Defendants could have objected.  The jury's heard that during the evidentiary --

THE COURT:  I don't think there's any prejudice to the Plaintiff to keep it at a higher level and say they haven't shown you any evidence, they haven't shown you any documents.  I think that language in argument is fine.  I think anything more granular that touches on source code itself falls within the category of what Mr. Mathews has raised, and I'm going to instruct you not to do that or make clear to Mr. Anaipakos not to do that.

MR. ALAVI:  And I will make that clear to him, Your Honor.

THE COURT:  All right.

MR. ALAVI:  Thank you.

THE COURT:  Are there any other matters that need to be raised?

MR. MATHEWS:  Nothing from Defendant, Your Honor.

THE COURT:  Are the parties prepared at this time to read into the record the items from the list of pre-admitted

1267

exhibits that may have been used during yesterday's portion of the trial?  If so, let's get that completed.

MR. LARSON:  Your Honor, yesterday the Plaintiffs introduced PX 160.

THE COURT:  All right.  Thank you, Mr. Larson.  Any objection to that?

MS. CHURCHMAN:  No objection from Defendants, Your Honor.

THE COURT:  All right.  Do Defendants have a similar rendition to offer?

MS. CHURCHMAN:  Yes, Your Honor.  Clare Churchman for Defendants and Intervenor.

Yesterday Defendants used DX 14, DX 19, DX 20, and JX 2. And as part of yesterday's offer of proof, Defendants used DX 21, DX 22, and JX 37.

THE COURT:  Any objection to that offer from Ms. Churchman, Mr. Larson?

MR. LARSON:  No, Your Honor.

THE COURT:  All right.  Thank you, counsel.

All right.  Then at this point the Court will recess. I'll be back shortly, and we'll begin the final instructions to the jury immediately thereafter.

Court stands in recess.

(Brief recess.)

THE COURT:  Be seated, please.

1268

MR. ALAVI:  Your Honor, before you call the jury in, we have one follow-up issue based on the Court's rulings before the break.

THE COURT:  All right, sir.  What is it, Mr. Alavi?

MR. ALAVI:  And, Your Honor, I apologize for taking the Court's time.

After the Court's ruling on source code, I went to confirm with Defendants' counsel that that would be mutual, that the Defendants would not get up and say it's been disabled in the software, we've changed the software, we've rewritten the software.

I've at least gotten confirmation they are not going to say that, but I want to raise that with the Court because we think it would be fundamentally unfair if the Defendants can speak about source code and changes to the software without our ability to say the opposite.  We hope that they will hue the line in the appropriate way and just talk about it generically as they did at trial, which it's been disabled.

THE COURT:  Well, assuming Mr. Anaipakos is going to reserve part of his time for a final closing, if there's a door that's been opened by Defendants in their argument, then you need to approach the bench and get guidance on that before the second closing takes place.

MR. ALAVI:  Thank you, Your Honor.

THE COURT:  I really hope this closing argument

1269

doesn't devolve into a lot of back-and-forth objections and interruptions.  I don't think it makes -- personally, I don't think it makes either side look good to the jury, but I'll leave that in your hands.

MR. DACUS:  Just for clarity of the record, Your Honor, we don't intend to specifically reference source code with respect to that issue.

THE COURT:  All right.  Is there anything else I need to hear from counsel on before I bring in the jury and proceed to give them the Court's final instructions?

MR. ALAVI:  Nothing from Plaintiff, Your Honor.

MR. DACUS:  Nothing from the Defendants, Your Honor.

THE COURT:  I do want to say this to the ladies and gentlemen in the gallery.  The Court considers its final instructions to the jury and counsels' closing arguments to be the most serious part of an inherently serious process.

Consequently, I don't want any disruptions.  I don't want any noise.  I don't want any moving about.  I don't want people coming and going in and out of the courtroom.  If there is some staff person who's going to walk with a banker's box full of documents, do it now.  Don't do it once I bring the jury in.  If you need to pass documents back and forth, if you need to whisper to each other, do it now.  Don't do it after I bring the jury in.

And if you've got a device on your person that can

1270

possibly make any kind of a sound, you are responsible to make sure that doesn't happen.  And there will be consequences if that should occur.  So make completely sure that's not going to happen.  If you have any doubts, take it outside this courtroom.  The Court Security Officers will be glad to babysit it for you.  But I don't want disruptions once I bring the jury in.  If that's not clear, raise your hand and I will give you more precise guidance, but that is the Court's intention.

All right.  Mr. Estess, please bring in the jury.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Good morning, ladies and gentlemen.  Please have a seat.  Welcome back.

Ladies and gentlemen of the jury, you have now heard all the evidence in this case, and I am now going to instruct you on the law that you must apply.

I want you to understand each of you will have your own printed copy of these final jury instructions that I'm about to give you orally once you retire to the jury room, so there is no pressing need for you to take notes as I give you these orally, unless you particularly want to.

It is your duty to follow the law as I give it to you.  On the other hand, ladies and gentlemen, and as I've previously told you, you, the jury, are the sole judges of the facts in this case.

Do not consider any statement that I have made in the course of this trial or may make in the course of these instructions as an indication to you that I have any opinion about the facts in this case.

Now, you are about to hear closing arguments from the attorneys for the competing parties.  Statements and arguments of the attorneys are not evidence, and they are not instructions on the law.  They are intended only to assist you, the jury, in understanding the evidence and the parties' competing contentions.

A verdict form has been prepared for you, and you will take this verdict form to the jury room when you retire.  And when you have reached a unanimous agreement as to all the questions in the verdict form, then you will have your foreperson, who you will have selected, fill in those blanks to reflect your unanimous answers to those questions.  Once the jury form is completed, then your foreperson is to sign it, date it, and advise the Court Security Officer that the jury has reached a verdict.

Answer the questions in the verdict form from the facts as you find them to be.  Do not decide who you think should win this case and answer the questions to reach that result. Again, ladies and gentlemen, your answers to those questions and your verdict in this case must be unanimous.

Now, in determining whether any fact has been proven in

1272

this case, you may, unless otherwise instructed, consider the testimony of all the witnesses, regardless of who may have called them, and you may consider all the exhibits received and admitted into evidence, regardless of who may have introduced or presented them to you during the trial.

You, the jury, are the sole judges of the credibility of all the witnesses and the weight and effect to give to all of the evidence. Now, in deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You alone, ladies and gentlemen, are to determine the questions of credibility or truthfulness of the witnesses.

In weighing the testimony of the witnesses, you may consider a witness' manner and demeanor on the witness stand, any feelings or interest that they may have in the case or its outcome, any prejudice or bias about the case that the witness might have, and the consistency or inconsistency of their testimony, considered in the light of the circumstances. Has the witness been contradicted by other evidence? Has he or she made statements at other times and other places contrary to what they said on the witness stand? You, ladies and gentlemen, must give the testimony of each witness the amount of credibility and weight that you think it deserves.

You must also keep in mind that a simple mistake does not mean that a witness is not telling the truth intentionally.

You must consider whether any misstatement was an intentional falsehood or whether it was a simple lapse in memory, and what significance should be attached to that testimony.

Now, as I've previously told you, the attorneys in this case are acting as advocates for their competing clients, and they have a duty to object when they believe evidence is offered that should not be admitted or presented under the rules of the Court.

When the Court sustained an objection to a question addressed to a witness, you must disregard that question entirely, and you may draw no inference from its wording or guess or speculate about what the witness would have said if they had been permitted to answer the question.  However, if an objection was overruled, then you must consider the answer to that question just as you would any other answer to any other question as though the objection had not been made.

Now, by allowing the testimony or other evidence to be introduced over the objection of an attorney, the Court did not itself indicate any opinion as to the weight or effect of that evidence.

Also, at various times during the course of the trial it's been necessary for the Court to talk with the attorneys outside of your hearing, either here at the bench or by calling a recess and talking with them while you were outside of the courtroom.  This happens, ladies and gentlemen, because

1274

often during trials things arise that do not involve the jury. You should not speculate or guess about what was said during any such discussions that took place outside of your presence.

Now, there are two types of evidence that you may consider in properly finding the truth as to the facts in this case. One is direct evidence, such as the testimony of an eyewitness. The other is indirect or circumstantial evidence, that is, the proof of a chain of circumstances that indicates the existence or non-existence of certain other facts. As a general rule, you should understand that the law makes no distinction between direct evidence or circumstantial evidence, but simply requires that you find the facts based on all the evidence presented, both direct and circumstantial.

Now, certain testimony in this case has been presented to you through depositions. A deposition is the sworn, recorded answers to questions asked to a witness in advance of the trial. If the witness cannot be here to testify in person or if the rules of procedure otherwise permit, then the witness' testimony may be presented under oath in the form of a deposition.

Before the trial began, the attorneys representing the parties in this case questioned these deposition witnesses under oath. At that time, a court reporter was present and recorded their testimony. The witnesses were sworn and under oath. This deposition testimony, ladies and gentlemen, is

entitled to the same consideration as testimony given by a person in person in open court from the witness stand, and you should judge the credibility and the importance of deposition testimony to the best of your ability just as if the witness had testified in open court.

Now, while you should consider only the evidence in this case, you are permitted to draw such reasonable inferences from the testimony and the exhibits that you feel are justified in the light of common experience.  Said another way, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts that have been established by the testimony and evidence in this case. However, you should not base your decision on any evidence not presented by the parties during this case, including your own personal experience with any particular products that might be at issue in this case.

Now, unless I instruct you otherwise, you may properly determine that the testimony of a single witness is sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary, if after considering all the evidence, you believe that single witness.

When knowledge of a technical subject may be helpful to you, the jury, a person who has special training and experience in that technical field--they're called an expert witness--is permitted to state his or her opinions on those

technical matters to the jury.  However, ladies and gentlemen, you're not required to accept those opinions.  As with any other witness, it is solely up to you to decide whether or not to rely upon them.

Now, certain exhibits have been shown to you during the trial that were illustrations.  We call these types of exhibits demonstrative exhibits, or simply demonstratives for short.

Demonstrative exhibits are a party's depiction, picture, or model to describe something involved in this trial.  If your recollection of the evidence differs from the demonstratives, you should rely on your recollection. Demonstrative exhibits are sometimes called jury aids, and demonstrative exhibits, ladies and gentlemen, themselves are not evidence, but a witness' testimony concerning a demonstrative exhibit is evidence.

Let me be clear.  Demonstrative exhibits will not be available for you to review during your deliberations.

Now, in any legal action, facts must be proven by a required amount of evidence known as the burden of proof.  The burden of proof in this case is on the Plaintiff for some issues and on the Defendants for other issues.  And there are two burdens of proof that you will apply in this case.  We've already discussed these, and they are the preponderance of the evidence and clear and convincing evidence.

As you know, the Defendants in this case are AT&T Corp, AT&T Mobility, LLC, AT&T Mobility II, LLC, and AT&T Services, Inc., who you've heard referred to collectively throughout the trial simply as AT&T.  In addition to AT&T, Ericsson, Inc., has intervened in this case on the side of AT&T by joining in this lawsuit after the case was filed.  Technically, this means that Ericsson is known as what is called an intervenor.  Practically speaking, though, Ericsson is working cooperatively with AT&T to defend against the allegations brought by the Plaintiff Daingean.

However, and to be clear, Ericsson itself has not been accused of infringement by Daingean in this case even though throughout the trial you may have heard AT&T and Ericsson collectively joined or referred to as the Defendants.

Now, the Plaintiff in this case, Daingean Technologies, Ltd., who you've heard referred to throughout the trial simply as Daingean or as the Plaintiff, has the burden of proving patent infringement by a preponderance of the evidence.  Daingean also has the burden of proving damages for any patent infringement by a preponderance of the evidence.

A preponderance of the evidence, to review, means evidence that persuades you that a claim is more probably true than not true.  Sometimes this is talked about as being the greater weight and degree of credible testimony.

Now, the Defendants have the burden of proving invalidity

1278

of the asserted claim by clear and convincing evidence.  To review, clear and convincing evidence means evidence that produces in your mind an abiding conviction that the truth of the party's factual contentions are highly probable.  Although proof to an absolute certainty is not required, the clear and convincing evidence standard requires a greater degree of persuasion than is necessary for the preponderance of the evidence standard.

Simply put, ladies and gentlemen, if proof establishes in your mind an abiding conviction in the truth of the matter, then the clear and convincing evidence standard has been met.

Now, as I've previously told you, these two burdens of proof are not to be confused with a third and altogether different burden of proof known as beyond a reasonable doubt. That's the burden of proof applied in a criminal case, and it has no application in a civil case such as this.  Beyond a reasonable doubt is a higher standard than both the preponderance of the evidence and clear and convincing evidence.

Now, as I did at the start of the trial, I'll first give you a summary of each side's contentions in this case, and I'll then provide you with detailed instructions on what each side must prove in order to win on each of its contentions.

As I've previously told you, this is an action for patent infringement.  And Daingean, the Plaintiff, contends that

AT&T, the Defendant, infringes claim 12 of United States Patent No. 8,576,803, which you've heard referred to throughout this trial as the '803 Patent.  You may also have heard the '803 Patent generally referred to as the asserted patent or as the patent-in-suit.  And claim 12 of the '803 Patent has been referred to during the trial as the asserted claim.

Now, Daingean contends that AT&T has infringed the asserted claim of the patent-in-suit by using, in the United States, 5G base stations for a communication system in the AT&T 5G cellular network.  Sometimes in these instructions I may refer to these base stations as the accused products. Daingean contends that the accused products infringe claim 12 of the '803 Patent.  And Daingean contends that it's entitled to money damages in the form of a lump sum reasonable royalty for AT&T's infringement.  Daingean has the burden to prove these issues by a preponderance of the evidence.

Defendants AT&T deny that the accused products infringe the asserted claims.  Ericsson denies this as well. Defendants deny that AT&T owes Daingean any money damages.

Defendants further contend that the asserted claim of the '803 Patent is invalid because it is not new and separately because the specification does not enable the full scope of the claimed invention.  Defendants have the burden to prove invalidity under either of these theories by clear and

Case 2:23-cv-00123-JRG-RSP    Document 586    Filed 09/27/25    Page 33 of 113 PageID #:  25459

1280

convincing evidence.

Now, if you decide that the asserted claim has been infringed and is not invalid, then you'll need to decide what amount of money damages, if any, to be awarded to Daingean to compensate it for that infringement.

But before you can decide many of the issues in this case, you will need to understand the role of the patent claims.  The patent claims, ladies and gentlemen, are those numbered sentences at the end of the patent.  The claims define the Plaintiff's rights under the law.  The claims are important because it is the words of the claims that define what a patent covers.

Now, the figures and the text in the rest of the patent provide a description and/or examples of the invention, and they provide a context for the claims, but it is the claims themselves that define the breadth of the patent's coverage. Each claim is effectively treated as if it were a separate patent, and each claim may cover more or may cover less than another claim.  Therefore, what a patent covers depends on what each of its claims covers.

Now, you will first need to understand what the claim covers in order to decide whether or not there is infringement of the claim and to decide whether or not the claim is invalid.  Now, the law says that it's my role as the presiding judge to define the terms of the claim, and it's your role to

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

apply my definitions to the issues that you are asked to decide in this case.

Therefore, as I've explained to you at the beginning of the case, I've already determined the meaning of certain language from the claim and I've provided you with my definitions, sometimes called constructions, of these certain claim terms.  These definitions are set forth in your juror notebook, and you can refer to them during your deliberations.

However, ladies and gentlemen, you must accept my definitions of these words in the claim as being correct. It's your job to take these definitions or constructions and apply them to the issues that you are deciding, including the issues of infringement and the issues of invalidity.  And you should disregard any evidence presented during the trial that contradicts or is inconsistent with the constructions and definitions that the Court has given you.

Now, for claim limitations or claim language that I have not expressly construed or defined, it is your job to use the plain and ordinary meaning of those limitations or language as understood by one of ordinary skill in the art, which is to say, in the field of the technology of the patent at the time of the alleged invention.  The meaning of the words of the patent claims must be the same when deciding the issue of infringement and when deciding the issues of invalidity.

And as I've noted, you've been provided with a copy of

the asserted patent, the '803 Patent, in your notebooks, and you may refer to it, too, as a part of your deliberations. You may refer to everything in your juror notebooks during your deliberations.

Now, I'll explain to you now what a claim covers and what a claim defines what it covers.

A claim sets forth in words a set of requirements. And each claim sets forth its requirements in a single sentence. If a product satisfies each of the requirements in that sentence, then it covers and infringes that claim. There can be several claims in a patent, and a claim may be narrower or broader than any other claim by setting forth more or fewer requirements.

The coverage of a patent is assessed on a claim-by-claim basis, and in patent law the requirements of a claim are often referred to as the claim elements or the claim limitations. When a product meets all the requirements of a claim, the claim is said to cover that product, and that product is said to fall within the scope of that claim.

In other words, a claim covers a product where each of the claim elements or limitations is present in that product. If a product is missing even one limitation or element of a claim, then the product is not covered by the claim. And if the product is not covered by the claim, the product cannot infringe the claim.

Now, if a person or corporation uses within the United States what is covered by a patent claim without the patent owner's permission, that person or corporation is said to infringe the patent.

To determine whether there is infringement, you must compare the asserted claim, as I have defined it for you, to the accused products. You should not compare the accused products with any specific example set out in the patent or with the prior art in reaching your decision on infringement.

In deciding infringement, ladies and gentlemen, the only correct comparison is between the accused products and the limitations of the asserted claim as the Court may have interpreted or construed the language in that claim. AT&T can be liable for infringement if you conclude that any accused use infringes. You must reach your decision as to infringement based on my instructions about the meaning and scope of the claim, the legal requirements for infringement, and the evidence presented by both of the parties over the course of this trial.

I'll now instruct you on the specific rules that you must follow to determine whether Daingean has proven by a preponderance of the evidence that AT&T has infringed the asserted claim, claim 12 of the '803 Patent, by using the accused products in the United States.

A patent can be infringed, ladies and gentlemen, even if

the alleged infringer did not have knowledge of the patent, and without the infringer knowing that what it did was infringement of a claim.  A patent claim may also be infringed even though the accused infringer believed in good faith that what it did was not infringement of the patent.

To prove infringement, Daingean must prove by a preponderance of the evidence that AT&T used within the United States a product that meets each and every element or limitation of the asserted claim.  To determine whether the accused product infringes the asserted claim, you must compare the accused product with each of the limitations or requirements of that claim to determine whether all those requirements in the claim have been met.

To use a system for purposes of infringement, a party must put into -- must put the invention into service, that is, control the system as a whole and obtain benefit from it.  To infringe a claim that recites capability and not actual operation, if an accused device is readily configurable to operate in the described mode as it may be found to infringe, even though it may also be capable of non-infringing modes of operation.

However, a device does not infringe simply because it is possible to alter it in a way that would satisfy all the limitations of a patent claim.  If a defendant could not readily activate the allegedly infringing functionality in an

accused product, or if it could only infringe if it modified an accused product to operate as recited in the asserted claim, then it does not infringe.

A claim element is present if it exists in the accused product as it is described in the claim language either as I have explained it to you, or if I did not explain it to you, according to its plain and ordinary meaning as understood by one of ordinary skill in the art.

Now, if any element recited in a claim is not found in an accused product, then you must find that particular product does not infringe that claim. However, if an accused product has each and every one of the claim limitations, infringement of that claim is shown even if the product contains additional features or elements that are not required by the claim.

Now, several times in these instructions I have referred or will refer to a person of ordinary skill in the field of the invention, or a person of ordinary skill in the art. It's up to you, ladies and gentlemen, to decide the level of ordinary skill in the field of the invention.

In deciding the level of ordinary skill in the field, you should consider all the evidence introduced during the trial, including but not limited to:

1. The levels of education and experience of inventors and other persons actively working in the field;

2. The types of problems encountered in the field;

1286

3.    Prior art solutions to those problems;

4.    The rapidity with which innovations are made; and

5.    The sophistication of the technology.

The person of ordinary skill is a person of ordinary creativity that can use common sense to solve problems.

I'll now instruct you on the rules that you must follow in deciding whether or not the Defendants have proven by clear and convincing evidence that the asserted claim, claim 12, of the '803 Patent, is invalid.  Patent invalidity, ladies and gentlemen, is a defense to patent infringement.  Invalidity and infringement, however, are separate and distinct issues and must be separately decided by you.

An issued United States patent is accorded a presumption of validity based on the presumption that the United States Patent and Trademark Office, which you've heard referred to either as the PTO or the Patent Office, acted correctly in issuing the patent.  This presumption of validity extends to all issued United States patents.

In order to overcome this presumption of validity, the Defendants must establish by clear and convincing evidence that the asserted claim is invalid.  Given this presumption, you, the jury, must determine whether or not the Defendants have proven that the asserted claim is invalid.

Now, claims are construed in the same way for determining infringement as for determining invalidity, and you must apply

the claim language consistently and in the same manner for the issues of infringement as for the issues of invalidity.

Now, as I explained earlier, a previous publication that predates the claimed invention is generally called prior art. Prior art may include publications that disclose the claimed invention or elements of the claimed invention.  Prior art also includes the knowledge of a person of ordinary skill in the art in the United States prior to the date of the invention.

In evaluating the prior art to determine whether invalidity has been proven by clear and convincing evidence, you may consider whether that prior art was or was not considered by the Patent Office, the PTO.  If you find that prior art which was not before the PTO is probative, then you may, but you are not required, to weigh that prior art more heavily when considering where the Defendants carried their burden of proving invalidity.

In deciding validity, the only correct comparison is between the prior art and the requirements of the asserted claim.  It is improper to consider and compare the prior art to the accused product.  It's not improper to consider the prior art; it is improper to compare the prior art to the accused product.

I'll now instruct you on how to determine whether the asserted claim of the asserted patent is invalid as being

anticipated.  In order for someone to be entitled to a patent, ladies and gentlemen, the invention must actually be new.  In general, inventions are new when the asserted claim has not been disclosed before.

Defendants contend that claim 12 of the '803 Patent is invalid because the claimed invention is not new.  In other words, Defendants contend that the asserted claim is anticipated by the prior art.  Anticipation requires that all elements of a patent claim be disclosed and set forth in a single prior art reference.  Also the single prior art reference must disclose all of the elements of the claim arranged or combined in the same way as in the claim, as the claim has been construed or interpreted by the Court.

Defendants must prove by clear and convincing evidence that the asserted claim was anticipated by the prior art reference.

To anticipate the invention, the prior art does not have to use the same words as in the claim, but all the elements or requirements of the claim must have been disclosed, either expressly or impliedly, to a person having ordinary skill in the art of the technology of the invention so that looking at that one prior art reference, that person could make and use the claimed invention.

Keep in mind that Defendants may not establish anticipation by arguing that the accused products practice the

prior art, or by comparing the accused products to a prior art reference.

Now, another way that a patent can be invalid is if it fails to disclose sufficient information to enable persons of ordinary skill in the field of the invention at the time the patent application was filed to make and use the full scope of the claimed invention without undue experimentation. This is known as the enablement requirement.

Defendants contend that the asserted claim, claim 12, of the '803 Patent is invalid for a lack of enablement. To succeed, Defendants must show by clear and convincing evidence that the '803 Patent specification does not contain a sufficiently clear and full description to have allowed a person of ordinary skill in the field of the technology of the patent to make and use the full scope of the claimed invention as of the filing date without undue experimentation. If a patent claim, ladies and gentlemen, is not enabled, it is invalid.

In considering whether a patent complies with the enablement requirement, you must keep in mind that patents are written for persons of ordinary skill in the field of the invention. Thus, a patent need not expressly state information that persons of ordinary skill in that field would be likely to know or could obtain without undue experimentation.

1290

Now, factors that you may consider in determining whether persons of ordinary skill in the field of the invention would require undue experimentation to make and use the full scope of the claimed invention include the following:

1.  The quantity of experimentation necessary and whether that experimentation involves only known or commonly used techniques;

2.  The amount of direction or guidance disclosed in the patent;

3.  The presence or absence of working examples in the patent;

4.  The nature of the invention;

5.  The state of the prior art;

6.  The relative skill of those in the art;

7.  The predictability of the art; and

8.  The breadth of the claims.

These factors are sometimes called the Wands factors.  No one or more of these factors is alone dispositive.  Rather, you must make your decision about whether or not the degree of experimentation required is undue based on all the evidence presented to you.  And you should weigh these factors and determine whether or not, in the context of the invention and the state of the art at the time of the filing date, whether a person having ordinary skill would need to experiment unduly to make and use the full scope of the claimed invention.

Now, if you find that the accused products are infringed and that they infringe the asserted claim, and if you find that the asserted claim is not invalid, then you'll need to consider what amount of damages, if any, to award to Daingean to compensate it for that infringement.

I'm now going to instruct you about the measure of damages. But, ladies and gentlemen, by instructing you on the measure of damages, I am not suggesting which party should win this case on any issue. If you do not find that AT&T infringed the asserted claims, or if you find that the asserted claim is invalid, either for anticipation or for lack of enablement, then Daingean is not entitled to any money damages.

The Plaintiff Daingean has the burden to establish the amount of its damages by a preponderance of the evidence. In other words, you should award only those damages that Daingean establishes that it more likely than not suffered as a result of AT&T's infringement. While Daingean is not required to prove the amount of its damages with mathematical precision, ladies and gentlemen, it must prove them with reasonable certainty. Daingean is not entitled to damages that are speculative, damages that are only possible, or damages that are based on guesswork.

The damages you award, if any, must be adequate to compensate Daingean for any infringement that you may find.

You must not award Daingean more damages than are adequate to fully compensate it for the infringement you have found. Also, you must not include in any damages amount an additional amount for purposes of punishing AT&T or for setting an example.

I'm now going to instruct you on how to calculate reasonable royalty damages.

In this case Daingean seeks damages in the form of a lump sum reasonable royalty.  The patent laws provide that damages for infringement may not be less than a reasonable royalty.  A royalty is a payment made to a patent holder in exchange for the right to use the claimed invention.  A reasonable royalty is the amount of royalty payment that a patent holder and the alleged infringer would have agreed to in a hypothetical negotiation taking place at a time prior to when infringement first began.

Since Mitsubishi owned the '803 Patent when the alleged infringement first began, the licensor in this hypothetical negotiation would have been Mitsubishi, and the licensee in the hypothetical negotiation would have been AT&T.

Evidence of things that happened after infringement first began can be considered in evaluating the reasonable royalty, but only to the extent that the evidence aids in assessing what the royalty would have resulted -- what royalty would have resulted from a hypothetical negotiation taking place

just prior to when infringement began.

Now, the parties in this case, ladies and gentlemen, agree that any damages you award should be in the form of a lump-sum royalty. A lump-sum royalty is when the infringer pays a single, one-time payment or price for a license covering both past and future infringing sales or use for the life of the patent. Thus, if you find that Daingean is entitled to damages, then the damages you award, if any, should reflect the total amount necessary to compensate Daingean for AT&T's past and future infringement.

In considering this hypothetical negotiation, you should focus on what the expectations of the licensor (Mitsubishi) and the licensee (AT&T) would have been had they entered into an agreement at that time and had they acted reasonably in their negotiations. You must assume that both parties believed the asserted claim was valid and had been infringed, and that both parties were willing to enter into an agreement. The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation and not simply a royalty that either party would have preferred.

Now, the law requires that any damages awarded to the Plaintiff correspond to the value of the alleged inventions within the accused products, as distinct from other, unpatented features of the accused products or other factors such as marketing or advertising or AT&T's size or market

position.  This is particularly true where the accused product has multiple features and multiple components not covered by the patent, or where the accused product works in conjunction with other non-patented items.

Therefore, the amount you find as damages must be based on the value attributable to the patented technology.  If the unpatented features contribute to an accused product, you must apportion that value to exclude any value attributable to unpatented features.  You must determine an appropriate royalty rate and an appropriate royalty base that reflect the value attributable to the patented invention alone.  Daingean, the Plaintiff, bears the burden to establish the amounts attributable to the patented features.

In determining a reasonable royalty, you should consider all the facts known and available to the parties at the time infringement began.  Some of the kinds of factors that you may consider in making your determination are as follows:

1.  The royalties received by the patentee for the licensing of the patent-in-suit, proving or tending to prove an established royalty.

2.  The rates paid by the licensee for the use of other patents comparable to the patent-in-suit.

3.  The duration of the patent and the term of the license.

4.  The established profitability of the product made

under the patent; its commercial success; and its current popularity.

5.    The utility and advantages of the patented property over the old modes or devices, if any, that had been used for working out similar results.

6.    The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

7.    The extent to which the infringer has made use of the invention and any evidence probative of the value of that use.

8.    The portion of the profit or of the selling price that may be customary in the particular business or comparable businesses to allow for the use of the invention or analogous inventions.

9.    The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

10.    The opinion testimony of qualified experts.

11.    The amount that a licensor, such as Mitsubishi as the owner of the '803 Patent at the time, and a licensee, such as AT&T, would have agreed upon at the time the infringement began if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount that a prudent

licensee--who desired as a business proposition to obtain a license to manufacture and sell a particular article embodying the patented invention--would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable to a prudent patentee who was willing to grant a license.

You may have heard these factors referred to during the trial as the *Georgia-Pacific* factors. No one of these factors is dispositive, and you can and you should consider the evidence that's been presented to you in this case on each of these factors. And you may also consider, ladies and gentlemen, any other factors which, in your minds, would have increased or decreased the royalty AT&T would have been willing to pay to the patent owner at the time, Mitsubishi, and Mitsubishi would have been willing to accept that if both were acting as normally prudent business people.

Now, when determining a reasonable royalty, you may consider evidence concerning the amounts that other parties have paid for the rights to the patent in question or for the rights to similar technologies. Comparable license agreements are one factor that may inform your decision as to the proper amount of the reasonable royalty award. Such licenses may indicate the patented invention's economic value in the marketplace.

A license agreement need not be perfectly comparable to a

hypothetical license that would be negotiated between the patent owner and the alleged infringer in order for you to consider it.  However, if you choose to rely upon evidence from any other license agreements, you must account for any differences between those licenses and the hypothetically negotiated license, such as whether they involve comparable technologies, comparable economic circumstances, comparable structure, and comparable scope, when you make your reasonable royalty determination.  In the context of the hypothetical negotiation, it is not necessarily the case that each patent covered by other licenses that were presented contributes equally to the amount that was paid for those licenses.

Now, in considering the evidence of a reasonable royalty, you are not required to accept one specific figure or another for the reasonable royalty.  You're entitled to determine what you consider to be a reasonable royalty based on your consideration of all the evidence presented by the parties during the trial, whether that evidence is of a specific figure or a range of figures.

In calculating damages, you may only award damages to Daingean for infringement that occurred after the damages period began.  The damages period for issues related to infringement of the '803 Patent began no earlier than March the 7th, 2022, which runs through, but not after, January the 9th, 2028, which is the expiration date of the '803 Patent.

Now, with these instructions, ladies and gentlemen, we'll proceed at this time to hear closing arguments for the attorneys for the competing parties.

The Plaintiff may now present its first closing argument to the jury. Would you like a warning on your time, Mr. Anaipakos?

MR. ANAIPAKOS: Please, Your Honor. If I could have a warning at 25 minutes.

THE COURT: I'll warn you when you have used 25 minutes.

MR. ANAIPAKOS: Yes, Your Honor.

THE COURT: Okay. You may proceed with your first closing argument at this time.

MR. ANAIPAKOS: Thank you, Your Honor. And may it please the Court.

Good morning, everybody. We're almost there.

I told you when we met almost exactly a week ago that we were going to take you behind the scenes of AT&T and Ericsson, two of the largest technology companies on earth, and show you what the rest of the public will never get to see--confidential documents, simulations, confidential test results. Top secret source code reviewed to show infringement. World class experts guiding us through complicated, sophisticated technologies, Doctors Feuerstein, Kowalski, and Sundaresan methodically teaching us all about

the inner workings of cellular communications in this country, base stations, and the patent system.  You've seen it all and it was a lot of work.  We showed up in this courtroom every day, rolled up our sleeves and got to work.  But you did, too.  You were here on time and worked hard, and we noticed and we are so thankful for your work.

And all of it proves what we knew it would--that AT&T has used claim 12 of the '803 Patent countless times every day without permission and without paying for it.  And the reason is simple:  They've spent over a billion dollars a month every month for the last four years buying up their single most important asset--spectrum.  You all know it by now--scarce, insanely expensive, and mission critical.  You can probably finish the sentence--no spectrum, no business.

And what is the threat to spectrum?  Exploding cellular demand.  It's all of us.  AT&T is a victim of its own success.  As cellular demand has absolutely skyrocketed, the stress on their networks has grown quickly, too.  We all want more and more and more data, and we want it right this very second.

But with this flood of more and more data-hungry users comes more inter-cell interference and slower throughput, slower speeds.  And that's one of the worst enemies of AT&T's 5G networks.  They gobble up spectrum, they degrade service, and they slow a business that cannot afford to wait.  So job No. 1 at AT&T is to maximize spectral efficiency and stretch

1300

that $55-billion-dollar investment as far as it will go. That's where the '803 Patent comes in.

You have three very important questions to answer, and I'm going to talk to you about each of them--infringement, validity, and damages. But I also want to talk to you about what AT&T and Ericsson have done this week because the contrast is stark.

While we got into the hard details of technology, they talked to you about cookies and ingredients and soccer balls and Coke cans. We brought you their source code, their documents, their results. We played you videos of their executives talking about this technology before lawyers were involved, before lawsuits had been filed. We proved our case through them.

And how did they respond? They responded by doing things like refusing to call Dr. Tanaka Dr. Tanaka, by denigrating Mr. Padian and his business, all the while ignoring the fact that AT&T has a very large part of its own business that does the very same thing or that Ericsson came knocking on his door two months ago trying to partner with them. Their strategy boils down to two things--don't believe your lying eyes; and when it comes to the evidence and claim 12, they're trying to shrink our property lines.

So let's talk about infringement. The law on infringement is on the screen. And AT&T can be liable for

infringement if you conclude that any accused use infringes. We showed you the three accused devices, and you know them well by now. They're the two RAT features, and then there's the RAIT feature of EIS. If AT&T infringes on any one of those three, then it infringes. We don't have to prove that they infringe all three even though that's exactly what we've done.

This case was presented to you by a remarkable expert. Dr. Feuerstein is not a professional witness. He has more than 35 years of experience. He rarely testifies. Dr. van der Weide, on the other hand, is sort of the opposite. He makes half of his income in a given year testifying for folks just like this. He's a smart man, but he spent less than a year at Motorola and hasn't worked in the industry since. Dr. Feuerstein and Dr. Kowalski have more than 70 years of combined experience in this very neighborhood -- in this very industry, rather.

Dr. van der Weide spent -- I was surprised when I heard him admit it yesterday, he spent a total of 80 hours working on this matter. Dr. Feuerstein spent hundreds and hundreds and hundreds of hours working on this. So I went and got it. This is the work, I'm holding it, that Dr. van der Weide did to show you infringement. Other than the patent, it's these four pieces of paper. That's it. That's it.

These are the three infringing features that you now know

1302

well. All are made by Ericsson. Two of them are the established MIMO features at the heart of AT&T's network. The third one, RAIT, we're going to talk a lot about that. It also infringes. There's no doubt.

Yesterday did you hear Dr. van der Weide talk about why EIS didn't infringe? He didn't say a word about it. Instead, they have this elaborate game trying to deceive you. They come in here and say, well, it's not activated. We haven't served a single customer with it.

We've known that for months, for months. But that's not the point. When you look at the Court's instructions on what infringes, it is capable of infringing. It's sitting on their base stations right now just waiting to be turned on. We'll talk about that more in a minute.

This case came down on infringement to three limitations--[C], [E], and [F]. I'm not going to go through every one of them because that's where the focus is. So let's start with 12[C]. This is the one that's sometimes referred to as 'not directed to'.

Dr. Feuerstein showed you Ericsson evidence about how these UE-specific beams are narrow, customized, tailored and focused. Let's be very clear. Okay? You look at claim 12. The words 'inter-cell interference' don't appear anywhere. Nowhere. Interference only appears once in 12[F]. So why have they been talking about whether or not this product

solves inter-cell interference?  We say it does, they say it doesn't.  But they blur the lines.  Why?  Because they want to try to get out of infringement in that debate.

But inter-cell interference has nothing to do with whether or not they infringe claim 12.  The Judge has instructed you on that.  You look at what the claim says.  You're not going to find that phrase anywhere in claim 12.

Now, you don't have to believe us on 12[C] on this directed issue because you heard it straight from them.  Ericsson's own words from its industry experts.  You remember the video.  It's Plaintiff's Exhibit 159.  And if you want to watch it during deliberations, it's about eight-and-a-half minutes long.  Watch the video.  Close your eyes and ask yourself, who does it sound like?  It's going to remind you of Daingean in this case, but it's coming out of their mouths.  Ask yourselves why that is.

Dr. Dr. Tombaz--she has two Ph.D.s--says they can boost the signal exactly to where they want to towards the user we want to have the communication with.  She continues, We create beams and at the same time we reduce the interference--her words--to all other directions where we don't want the energy to go or come from.  What she's saying is we're reducing interference, we're taking those lobes you've heard about and sending them where we want them and not where we don't.  12[C] is met.

1304

She continues, At the same time, minimize interference to all the other directions where we don't want to spread the energy.  How much more clear can you be?  And this is not from Daingean.  This is directly from the mouths of Ericsson, the people who made these base stations.

Now, you remember that crazy picture with all the colored lines?  And the first time you saw it, you probably thought, I have no idea what this is.  Now we all know:  All of those crazy lines are going to the same place, to that phone.  And why is that?  Because these aren't random.  They're taking a bunch of different roads, but all roads to Rome, all roads are going to that phone.  By directing the lobe -- all these different lobes to one handset, you're not directing them to adjacent handsets.  It makes perfect sense.

So what do they do?  They look at 12[C], the language is on the screen, and then they have Dr. van der Weide testify and he starts to use phrases that you're not going to find anywhere in claim 12, things like steered away from, not pointed at, he was saying.  Directed away from.  They add stuff that isn't in the claim.  And why do they do that?  They want to take our property--remember the yellow border?--and they want to shrink it.  That's what's been happening in this case.

And when he's pushed on it, Dr. van der Weide to his credit admits that this isn't anywhere in the claim.  Is there

anything in this claim that says the beam must be steered away from?  Absolutely not.  Is there any requirement that it not be pointed at another phone?  There is no requirement.

Let's talk about claim 12[E].  This is the one that I call the honeycomb issue.  The problem here is that AT&T's network doesn't look anything like that honeycomb.  It's irregular.  Cells overlap with each other.

So the timing doesn't work like that *TV Guide* they tried to show you.  And Dr. van der Weide is very clear about it: You said that AT&T's network in no way resembles this arrangement, haven't you?

I may have said that.

In fact, you said that in your expert report.

I'm not surprised that I did.

And even if it did have that shape, like I said, those signals bounce around.  Remember that pinball-looking graphic that we saw with the pink ball?  The signals keep going.  That takes time because of the delays.  Remember this is happening thousands of times every second.  So they are going to be present in neighboring cells.  Just the slightest delay and that happens.  And Dr. Feuerstein explained how that was the case.

But Mr. Faxér admitted it under oath as well.  He testified under oath that SRS signals from neighbor phones are what?  They are heard as interference by the neighboring base

station.  Again, we proved our case from Ericsson's own words and documents.

Last limitation that was really in dispute is 12[F].  So let me walk you through claim 12[F].  Once again, it's common here.  What does AT&T do?  They try to rewrite the claim.

For this claim, Dr. Feuerstein walked you through how the SRS signal from contiguous cells are received as interference and processed by the base station to form a beam.  That's the 1, 2, and 3 on the screen.  Dr. Feuerstein explained that the base station determines an interference amount at the mobile phone based on the received adjacent cell SRS signal using what he called the principle of reciprocity.

This interference information is used to make decisions every time a beam is formed with these features.  Beams are formed on the basis of that information.  It happens again and again and again, 1, 2, 3, 1, 2, 3.  That's the way this works.

Now, again, you have the language of the claim on the screen.  What does Dr. van der Weide do?  He tries to add language to the claim.  You can't do that.  He starts to suggest it needs to be disaggregated interference.  You're not going to find that word anywhere in claim 12.  They are trying to shrink our property rights.  And eventually Dr. van der Weide had to agree that the claim does not use those words.

And it would be wrong to add words to a claim, wouldn't it?

1307

I agree with that.

Yet that's exactly what they tried to do.

Now I want to talk about EIS.  Again, AT&T didn't really try to contest that EIS doesn't infringe.  What they said is it's been disabled.  We haven't used it.  No calls have ever been made doing.  Their position is that it's restricted.  But ultimately they've been trying to deceive you on this technology.

Plaintiff's Exhibit 80 on the screen is one of the most important documents in this case.  It's what I call a smoking gun, and I think you ought to ask for it and look at it during deliberations.  Mr. Faxér wrote this letter with his lawyers, and it comes out of nowhere.  They don't have a single EIS complaint anywhere in this letter, not one, yet they want you to believe that the reason they didn't put out EIS is because of problems with EIS, it wasn't working.

Imagine that.  Mr. Faxér and his lawyers getting together, let's write a letter explaining to our customers that EIS doesn't work.  And what happens?  They don't put a word in the letter about any problems with EIS.  Does that add up?  Use your common sense as the Judge has instructed you.  We encourage you to do that.

And also Ericsson restricts the feature only for its U.S. customers.  If you're Ericsson and you have customers all over the world, why on earth would you do that?  We're going to let

our customers outside the United States use this product that's supposedly doesn't work?  It doesn't add up.

My colleague, Mr. Alavi, walked you through this timeline.  You probably remember.  They started working on EIS in 2015, and if you look at the screen, you're going to see nothing but good news--February of 2022, increased 40 percent.  Same thing in May, these tests and simulations.

In March, what happens?  They win an award at the biggest mobile conference in the world in Barcelona.  Mr. Faxér and his team go there and accept the award.  They put a press release on Ericsson's website.  It's still there right this very second.

And then after all of that, we file suit in March of 2023.  A couple of months later, they're continuing to do more testing in a New York field test.  And then expert reports come out in this case, and EIS is accused of infringement.  And then what happens?  This, in September of 2024, that restriction notice I showed you just came out.  There hasn't been any bad news to speak of, and yet this infringement -- this restriction notice comes out.

So what do they do?  They then supposedly create some sort of test in China, if you believe them, and things get really crazy from there.  I would really like you to look at the physical copy of Plaintiff's Exhibit 148, so if you want to look at it, write down the number and ask for it later.

1309

But Plaintiff's Exhibit 148 has two parts to it.  The first half is a part that Ericsson shares with customers like AT&T.  And you flip through it and it's going to tell you how great EIS is and all the benefits of EIS.  That's in December of the same year that they want you to believe this thing was restricted.  And the only reason given for the restriction, ladies and gentlemen, is the eight of you.  They said, we're going to restrict this until this matter is resolved.  That's today.

And if you go to the back of the same document, you're going to see some other test results supposedly from some test in China they claim they undertook, and at the top of it there's a red warning label--do not include this in customer presentation.  How do we reconcile this?  They're telling their customers, hey, it works great.  Then they say, oh, there's problems but don't tell the customers.  It's in the same document on the same day.

So the Judge has instructed you on how you infringe a claim.  You're probably asking yourselves, well, how can they infringe if they have EIS on their base stations but they can't use it?  And the law answers that for you.  An accused device is readily configurable to operate in the described mode, it may be found to infringe.  And at the end, if a defendant could not readily activate the allegedly infringing functionality, and it continues, then it does not infringe.

So if the thing is capable of infringing, it infringes.

Think about it this way. I bet a lot of you drove to work today or to court today. And if you think about it, I did the same thing. When you get into your car, what do you do? You put a key in the ignition. And then what happens? Your car starts and you drive away.

Their argument is that if you don't have the key, your car is incapable of driving, like, your car can't drive. You couldn't get in and start your car. Of course your car is capable of driving. All you need is the key. And Mr. Faxér made it very clear all they need is a license key to activate the software. That's correct. Just like all you need a key to start your car. All they need is a key to start EIS and they get it today.

Again, don't believe your lying eyes. They've been trying to tell you, we're not using this feature. Well, then why on earth is it right this very second on every one of their SU and MU-MIMO base stations on the n77 band? It's there. All you need is a key. Do you remember what their corporate representative said? He and some friends tried to start it, and what happened? They got a warning that they needed a key.

And, of course, Plaintiff's Exhibit 27 makes it very clear. What did they tell us about EIS? It can be enabled or disabled on the fly. That answers it for you.

1311

So there is Question No. 1, Did Daingean prove by a preponderance of the evidence that AT&T infringed claim 12 of the '803 Patent?  And remember, if either SU-, MU-MIMO or EIS infringes, and they all do, the answer to that question is yes.

Let's talk about validity.  You know by now that an issued patent like this one has a presumption of validity, and you also know that their burden to take away our property is greater than our burden to show infringement.  It's a clear and convincing standard, not a preponderance of the evidence.

Here the patent examiner was looking at Samsung.  There are five Samsung references listed on the screen.  He searched the Samsung patents during six years of patent examination. Now, on this argument of anticipation that somehow everybody missed it even though they were looking at Samsung for six years, they have to prove that every single thing was disclosed by this Kim reference.  Close doesn't cut it.  Very close doesn't cut it.  Very, very close doesn't cut it.  It has to be identical.

But there is a major problem with Dr. van der Weide's analysis.  None of the base stations in Kim beamform on the basis of all three inputs.  You have to point to a single base station that does all three things.  The Kim patent doesn't do that.

Let's turn to enablement.  Here it was pretty easy.  Only

1312

one of the two experts told you about the Wands factors that the judge has told you about and that are in your instructions, and that was Dr. Sundaresan.  Dr. van der Weide, the only time he mentioned the Wands factors was when he was cross-examined about why he hadn't spoken about them.  And this is different in a very real way than anticipation.

Here everybody agrees that the trained professionals at the Patent Office are looking at the same things that you're going to be looking at.  And the question you've got to ask yourself is, did these trained engineers look at this stuff for six years and really not realize that the patent taught anything, that the patent was enabled?  I mean, give me a break.  This argument is desperate.  It's the same heads, I win/tails, you lose that we've been hearing this entire case.

The answer to Question No. 2, Did they prove by clear and convincing evidence that this patent is invalid, is a resounding no.

The last topic for now--damages.

There is no question that tons of base stations around this country had that SU- and MU-MIMO feature on them.  And every one that has SU-MIMO and MU-MIMO on it also has EIS on it.  Make no mistake about it.  It's just the key to the car is missing.  They've been on since the quarterly release of the third quarter of 2024.

Now, Mr. Dell followed the law, which requires you to use

the hypothetical negotiation to calculate a reasonable royalty. Now, they keep talking about whether inter-cell interference is reduced. They say inter-cell is reduced. No, it's not. Maybe it's intra-cell. Maybe it's not. We've shown that it is. But the more important point is that their documents and our experts all agree--we save spectral efficiency for them. We make their spectrum more efficient. Mr. Faxér admits that:

In fact, they do improve spectral efficiency. Isn't that right?

Yes.

You remember Dr. Kowalski? He gave you the range of that improvement, 22.2 to 30 percent. And, honestly, Dr. Kowalski is lower than all of the other numbers you saw. You saw 40 percent up to 75 percent, not from him, from them; their documents, their simulations.

When asked about it, Mr. Loddeke had to admit that if you paid $60 million and got those kinds of spectral efficiencies, it would be a no-brainer.

Now, their expert came in and tried to paint Mr. Dell as an outlier, but we now know the truth. She talked about real estate and comparable properties, but what did she do? She took the three cheapest sales ever in the history of the neighborhood and used those as a comparable licenses to talk to you. She ignored every other more substantial sale in the

1314

neighborhood.  You can't rely on an approach like that.

So on the question of damages, what is the sum of money?  The answer is $59.2 million.  And let me be clear.  That is only for the RAT features.  So if you think that AT&T is only using this in RAT, SU- and MU-MIMO, that's the answer--$59.2 million.

If you think, as I do, that they're going to use EIS, that the moment they walk out of here, like their restriction notice says --

THE COURT:  25 minutes have been used.

MR. ANAIPAKOS:  Thank you, Your Honor.

They're going to walk out of here, the moment they walk out of here, they're turning that thing on.  I mean, how naive do they think we are?  That they test this thing for years and years, they put it on base stations all over the country, and the only thing they need is a key, there is awards, there's test results, there's all this great news, then they say, hang on, we're going to restrict it until these eight folks, the folks I'm talking to right now, are done?  Why would they do that?  If they didn't want it, it would be out of their network, and it's not.  It's not.

So if you think they're going to turn it on, and I sure as heck do, the answer is $80.1 million.  This kind of shenanigans needs to stop and you should look at the documents, look at the way they talk about this, and ask

yourselves, are they being honest with me?

More later.  Thank you very much for your time, ladies and gentlemen.  You've worked very, very hard, and we appreciate it.

Thank you, Your Honor.

THE COURT:  All right.  Defendant and Intervenor may now present their closing argument to the jury.

Would you like a warning on your time, Mr. Dacus?

MR. DACUS:  Yes, Your Honor.  Would you please let me know when I have five minutes remaining?

THE COURT:  I will do that.  You may proceed with closing argument at this time.

MR. DACUS:  Thank you very much, Your Honor.

Good morning.  I want to start this morning where I hope I've started with you each time I've had an opportunity to talk with you, and that is to say, on behalf of the men and women who work at AT&T and the folks who work at Ericsson a very sincere thank you for being willing to serve on this jury.

I know in talking to Mr. Loddeke last night and to Mr. Faxér, the thing they most want me to say to you is that that thanks is unconditional.  Regardless of what your verdict is, it is a thank you.  You may remember in jury selection, it was only last Friday, it seems like a month ago to me, that we talked about if you're falsely accused, whether it's in an

informal setting or a formal setting, the only thing you want is somebody to sit and listen to your side of the story. And that's the opportunity you've given to Ericsson and AT&T, and I know they are very grateful for you doing that.

When we first talked about this case, I told you that it was important to both AT&T and Ericsson as companies, and that from our perspective it had broader implications and ramifications. You probably have a little bit stronger evidence of what I was talking about when I said that at that point.

And you also know from what the Court has shown you, the video that you saw last Friday, that this patent system that we have comes directly from our Constitution. And the purpose of the system is very clear in the Constitution, and that is to promote the progress of science. And a large part of why AT&T and Ericsson are here is because we don't believe this lawsuit is about the true purpose and the true integrity behind our patent system.

A couple of fundamental principles that are absolutely at play and we would say at risk here. The first is when you get a patent, the patent claims defined what your property is in the patent. Okay? In return for getting those 20 years of exclusivity that the Government gives you, you, the patent owner, agree that whatever property you've got is what you got. You don't get to move your fence line. No matter how

1317

much incentive you may have, millions of dollars or otherwise, you get what you get and you don't get to expand it.  And that's what we need to talk about in this lawsuit.

You know that when you're accused of infringement, you have to come to a jury and ask them to answer these questions.  And the first question you're going to be asked when you go back in the jury room is, did AT&T through the use of these Ericsson base stations infringe these claims?  And you know that they accuse two different features in these base stations.  One is the interference sensing, which is the RAIT; the other is the MIMO features, which is the RAT features.

Let's be clear.  I know this lawyer showed you a portion of that jury instruction that the Judge just read you.  As the Court told you, when you go back there, you will have those instructions, and here's what I would ask you to do.  Open it up to page 12.

And, by the way, let me say something.  For those of you that are note takers, please take notes while I'm talking.  You will not offend me at all.  I want you to take notes, and I'm going to give you some things that I want you to jot down.

When you go back there, look at page 12.  And what is required to infringe is this:  For a feature, you must put it into service.  That's a quote.  And the accused infringer must receive the benefit of that feature.  So you have to put it into service and you have to receive the benefit to have

1318

infringed.  And we know for RAIT, the undisputed testimony is from Mr. Loddeke, Mr. Faxér, and indeed from their own expert, Mr. Feuerstein, RAIT was never activated, it was never used. Not a single customer at AT&T ever received any benefit from it nor did AT&T.  There's no infringement for RAIT because of that.

Now, one thing the lawyer for the Plaintiff said is, we didn't prove non-infringement for RAIT as it relates to the claim, and I'm going to show you that's not the case.  Neither one of these features uses this very specific '803 Patent.

So let's talk about the patent.  You've seen claim 12 a lot at this point.  You know now when I told you originally that it is -- it's about a very specific type of base station. You know that absolutely to be true, and we're going to go through this thing word for word.  But I think it's important to start at a high level.

On Monday, the very first thing that the Plaintiff told you -- this is the slide they showed you.  They said this '803 Patent is there to eliminate inter-cell interference.  That's what they told you the entire and sole purpose of this patent was.  Indeed, they showed you this diagram.  This is what they showed you on Monday.  They said, without the '803 Patent, folks have these wide, broad beams, but with the '803 Patent, they have these very narrow, focused beams that are directed away from and not at phones in the neighboring cell.  That's

how they described their patent to you on Monday.

Now, let's talk about the specifics of the patent.  You know that what's required is a base station that transmits a beam, part of that beam is directed to the phone actually in the area.  And, of course, we do that.  Of course, we're directing our beam to the phone in the area.

But there's an important and:  and that beam cannot be directed to phones in the areas contiguous.  And you remember on Monday I told you that word 'contiguous' was going to be important?  And it is.  No matter how much they want to ignore it, it's in here three or four times and it's very important.

So the question becomes do this -- does this RAT product, the only one that AT&T has ever used, does it direct the beam away from the contiguous areas?  And we know that it does not, and we know that from technical documentation.

I was curious as to how much technical documentation the lawyers on the Plaintiff's side were going to show you because it doesn't support what they say.  But I'm going to walk through and show you that the technical documents from Ericsson and AT&T prove, when this says not directed, that in fact our transmission beam is directed.

Here's the first document.  It's PX 73 at page 7.  You can write that down; you can look at it for yourself.  You can see that this red dotted line of interference is directed at the contiguous areas.  And, look, we know, we know how not to

1320

direct, because this RAIT feature, its whole intention -- and you can look at page 3 of that same document, PX 73, its whole intention was to direct away.

Now, it did not do it using these three ingredients that are called for in the patent, but we know what it looks like to try to direct transmission beams from away from phones in the adjacent cell.  Remember what the patent requires--directing away.

Here is another technical Ericsson and AT&T document, DX 94 at page 12.  You can look at it for yourself.  This is information that Mr. Lipschitz presented through the experts. Here's the AT&T system.  What's the level of interference, inter-cell interference?  It's high.  Here is the beams going to the adjacent cells, contrary to what the patent requires.

There's more.  This is PX 148 at page 7, if you want to look at it.  This is a representation of what the beam in the Ericsson base stations look like.  Remember what the Plaintiff said to you?  Remember, they said these are narrow focused beams under the '803?  Well, I can't remember if it was Mr. Mathews or Mr. Lipschitz, but one of them said, well, look at this turkey; we've got lobes going everywhere.  And, you know what, this little thing out here called a UE, that's a phone. Our lobes are pointed at it.  The patent says pointed away from them.  We're pointing it at it.

And you may say, well, why are you doing it that way?

1321

You've heard why.  We solved this problem in a very different way.  We have up to 200 lobes in a single beam, and each one of those lobes has low power.  So although there's interference, it's at such a low power that it doesn't degrade or materially affect our system.  This '803 Patent has been solved in a different way by AT&T and by Ericsson.

And I think it's good just to pause here.  This is what the Plaintiff said to you on Monday.  This is what the '803 Patent looks like.  This is what our system looks like.  Night-and-day difference between the patent and the way these base stations operate.

It goes further.  Same PX 73.  Look at page 34.  They told you on Monday that the patent is about eliminating inter-cell interference.  Right in the technical documents.  By the way, all these technical documents were written long before this lawsuit.  This is not something that was created for this lawsuit; they existed long before.  The RAT feature has the highest inter-cell interference level.

There's more.  PX 73 at page 26.  You can look at it for yourself.  The only feature that AT&T has ever used, the RAT feature, creates a lot of interference.  All those technical documents show that these base stations, these Ericsson base stations operate differently than what the patent describes.  And you don't have to take my word for it.  Here's why I say that.

1322

Dr. Sundaresan testified yesterday, Mr. Lipschitz had him on the stand and said, sir, I'm going to give you a true or false question.  The claim--so he's talking about the patent claim--requires a base station to direct a transmission beam away from the phones outside of the base stations.

And Dr. Sundaresan:  Of course, because that's what the claim says, that's true.  The patent requires that you direct the beam away.

So it begs the question, do these Ericsson base stations direct away?  We say no.  You know who else says, no, they don't?  Their own expert, Dr. Feuerstein.  When Dr. Feuerstein testified, Mr. Lipschitz asked him a true/false question:  The side lobes of the beams in these accused base station products are sometimes directed at phones in neighboring areas?  Yep. He had to admit they were.

So their own expert says the patent requires that you direct away, but Dr. Feuerstein their other expert says these base stations don't operate that way.

So what do we know from that?  And let me -- let me address one other thing before we sort of get to the conclusion on this.  They've showed you this video.  They actually just showed you another excerpt from this video, and I want to be very clear on this.  They highlighted this language right here, saying, oh, this video shows that you are minimizing interference.  But it begs the question, is that

1323

video talking about minimizing interference inside the cell or outside the cell? Because that matters dramatically. This patent is about reducing the interference outside the cell.

So here's what this lawyer didn't show you. Right down here, it says, We can ensure that all 5G users in the cell get the best performance. It's a little bit of a head fake here. This video is talking only about interference within the cell. The patent is talking about interference outside the cell.

You know how else we know that? Because that's exactly what Mr. Faxér told you. We asked him, Now, these questions that these lawyers are asking you, Mr. Faxér, about that video, is that video talking about interference outside the cell or inside? And he said, Of course it's talking about inside the cell. That's what MIMO is for is to reduce interference inside, not outside. But the patent is all about outside.

The result of this is this requirement to not direct beam to the area contiguous is not met. And that's enough just from that. There's no infringement.

But there's more. Because when you direct this beam away, you have to do it on the basis of these three ingredients. The first ingredient is that there must be a channel estimation signal received from the phone in the next-door neighbor, the contiguous cell.

So is that how the AT&T network operates with these base

1324

stations?  You know it's not.  You know that these are the phones that are contiguous.  We've sort of called them your next-door neighbor.  These phones out here are your neighbors two, three, four houses down.  And you know in the AT&T system we don't receive SRS signals from the next-door neighbor.  And there's a very good reason why.  It's because of this PCI that Dr. van der Weide explained to you.  It's what sometimes has been referred to, the honeycomb.

The way that system is set up, and maybe I'm the only one in the courtroom that is fascinated by it, but these things are alternating how they talk every thousandth of a second.  Think about that.  And our next-door neighbors are talking at a different time than phones within the cell.  So we're not receiving a signal from the next-door neighbor.

And I want to pause here because I think this is really important.  Dr. Feuerstein took the stand, and he testified for several hours.  And I'm going rely on your collective memory:  He did not refute anything about this PCI or this honeycomb.  He didn't say one word about it.  Look back at your notes if you took notes.  Not one word.

In fact, the only thing that happened, the only way they tried to refute this is that when their lawyer cross-examined Dr. van der Weide, they said, Well, hold on, this honeycomb, it's not exactly perfect, is it?  And we said, of course it's not exactly perfect.  The truth is it doesn't matter if it's a

hexagon, it doesn't matter what shape.

The only question under the patent is, are these next-door neighbors talking to us?  And it's undisputed that they do not.  We showed you this example.  This is like TV programming.  If you've got TV slots at 9:00, 9:30, and 10:00, those aren't overlapping.  They even have a little buffer between them just like the PCI system does in the AT&T system.

The result of that is this requirement, this second ingredient that requires a channel estimation signal received from the adjacent phone in the area contiguous, we don't do it.  Our system is set up differently.  We solved the problem in a very different way.

What about the third ingredient?  It requires receiving an interference amount from the phone in the area contiguous.  I don't need to belabor this point, but you know under our system we don't receive an interference amount from the next-door neighbor.  That's the area contiguous.  The way we're set up in the PCI system, we just don't receive it.

You know who agrees with that?  Dr. Feuerstein, their own expert.  We asked him, This interference that's coming, this red out here, is that an interference amount from the phone in the next-door neighbor?

No.  He said that's an aggregate amount.  It's just an aggregate amount of interference from your second, third, and fourth door neighbor or from other parts.

1326

What's the result of that?  We don't use the third ingredient, either.

Now, you know from what the Court's told you, any one of these independently, if you find that any one of these we've proven or that they've failed to prove, then there is no infringement.  And so when you go to the first question in your verdict form, when you go back to deliberate, the first question is going to be, Did the Plaintiff prove that AT&T infringed claim 12 of the '803 Patent?  Obviously it's your decision, but I would respectfully submit to you that the answer, based on the evidence, is no.

I'm going to turn to the second question.  I'll tell you this:  When you see the verdict form, if you answer the first question no, you're done.  But if you answer the first question yes, you turn to this question of validity, whether or not this patent was actually valid.  And you know from what the Court has said previously, from the video, that the ultimate determination on validity is made by a jury.

And that's for a very good reason--because when the Patent Office looked at this, it was a secret process between the Patent Office and Mitsubishi.  Nobody else got to participate.  Nobody else got to put forward information.  And as the Court has said and as the Court's video said, the Patent Office doesn't always have the information that you need to make an informed decision.  And that's exactly what

1327

happened in this case.

The Court just read you instructions again, just like he did preliminarily, in order to have a valid patent, your concept, your idea, your solution has to be new.  You can look at that in the jury instructions he just read to you, it has to be new.  So it begs the question, Was this '803 Patent new?  And we know a couple of things now and you know from the evidence.

The '803 Patent was filed in June of 2007.  In October of 2006 Samsung filed a patent application.  That patent application was actually published to the world in May of 2007, before the Daingean patent was filed.

And we know one other very important thing.  And don't be deceived.  I heard the other lawyer say, Oh, the Patent Office looked at Samsung.

There is no dispute the Patent Office did not look at this Samsung patent application.  We showed you that.  You can look on the face of the application.  We know they didn't look at it.  You are the very first people to ever compare this '803 Patent to this Samsung patent application to determine whether or not the patent was new.

And they keep saying, Well, they looked at it for six years.

You know what?  They could have looked at it for 60 years, 600 years, if they didn't have the right information.

1328

That's not the point.  We know and you know now that the concepts in the '803 Patent, this is the diagram from the Samsung patent, were all disclosed, every single one of them, and I'm going to go through them just to remind you.  They were all disclosed in Samsung before the '803 Patent.

In fact, I'm sure you remember this--Daingean admits, they don't even contest or fight that all of these things that I just circled, 23 of the 26 lines in the '803 Patent, they admit they were in the Samsung patent.  The only question is whether or not those lobes--and this is from the Samsung patent-- whether or not these lobes in the Samsung patent are directed away on the basis of an interference amount.  That's literally the only argument they could muster.

So let's talk about it.  And just so we're clear, in the Samsung patent, the one that came before, this is ingredient 1 right here.  This is ingredient 2 right here.  No dispute about that.  The only question is whether or not this base station 2, this green base station, redirects these beams on the basis of an interference amount, literally the only argument they could muster.

So what evidence is there?  Comes from their own mouth, from their own mouth and their own expert's mouth.  We asked Dr. Feuerstein, Now, in your view this word on the basis of, that means to be influenced by or affected by. Right?

And he said, Absolutely, yes, that's what it means.

1329

Now, there's a very important instruction the judge just gave you.  He gave it to you twice.  Look on page 10 and page 14 when you go back there.  However these folks interpret this patent for the purposes of infringement, they have to do it the same way for invalidity.  Same way.  You can't have two interpretations.  You can't have your cake and eat it, too.  You got to interpret it the same way.

So Dr. Feuerstein says 'on the basis of' means the beam needs to be influenced by.  So that's the question.  Is this base station influenced by this interference amount in redirecting those lobes?  The answer comes from their own mouth, Dr. Sundaresan.  You remember Dr. Sundaresan tried to dance on this a little bit.  Mr. Lipschitz had to pin him: Now, is it your testimony under oath, sir, that when the interference amount goes up at that red phone, talking about this right here, it will have absolutely no influence on, will not impact the beam sent by that green base station?

What did he say?  Well, it may influence it.

There's no may; it does influence, because five minutes before this question Dr. Sundaresan, when talking to his lawyer, had told you all about how this is binary information.  Remember he said it's 1s and 0s?  This base station is telling this base station either move your beam or don't move your beam.  There ain't no may.  That's what it does.  And that's ingredient 3 from their own mouth.

Every concept, every single concept in this '803 Patent had been previously disclosed by the Samsung patent.  The result of that is clear.  When you -- if you get to Question No. 2, did the Defendants prove by clear and convincing evidence that the '803 Patent is invalid, I don't think there's any doubt.

The Judge just read you about -- the instruction about burdens of proof, and remember in a criminal it's beyond a reasonable doubt.  It's much higher.  If this thing said beyond a reasonable doubt, I think you'd answer it yes.  But this standard that we have to meet is much lower than that.  It's just clear and convincing.  I'm not sure how it could be any clearer.

Dr. van der Weide walked you through it step by step and showed you.  I didn't even have to put up his testimony.  I just used their own words from their own experts.  The bottom line is it's a very simple concept--was the '803 Patent new or had someone else come up with it and disclosed it before then?  And the answer is, it wasn't new.

I want to cover one other thing on this invalidity issue just so we -- I don't know what they'll say when they get back up, but I know Dr. Sundaresan yesterday tried to say, Well, this base station doesn't actually receive the interference amount.

And you remember Mr. Lipschitz said, Hold on, it doesn't

1331

have to receive it.  Ingredient 1 and 2 have to be received, but all that has to happen for ingredient 3 is that on the basis of.

And Dr. Feuerstein says that just means it has to be influenced or affected by.  And it is, absolutely is.

I'm going to do this.  You know that we also have a separate basis for invalidity called enablement.  We've put forward all of that evidence.  And I'll be candid with you, that's a much more difficult thing to prove because you're trying to prove the negative.  You're trying to show that within this patent, when they wrote that third ingredient, they didn't explain to somebody how to make and use it.  So we've all had the experience of trying to make -- of trying to explain the negative.  It's tough.

But if you open up that patent, the fact is they didn't explain to anybody how to make and use it.  And if you just think about it from a common sense standpoint, you know why. Remember that the Patent Office rejected everything in that patent claim, and then they wrote in the third ingredient. But what they didn't do when they wrote that in is they didn't explain in the patent how to make and use it.  And that's what they have to do.

So I'll be perfectly candid with you.  I'm a little hesitant to talk to you about enablement because I think it's so clear that that Samsung patent was in front of and came

1332

before the '803 Patent that I really want you to focus on that. But the fact is this patent also was not enabled.

Let me take just a few minutes to talk to you about I'm certain is our least favorite topic, and that is the amount of money these folks want and the damages that they want.

You remember when we first talked about this in opening, I said to you, or what I asked you to do is just listen to the method and the process that they would go through to try to reach and get to this $60 million number because I think it tells you a lot, not just about what this case is really about other than what they say it's about, but it's what it's really about. And it tells you a lot about credibility also.

And there's -- let's just talk at a high level to start with. What these folks want to do is grab some percentage of the cellular revenues, meaning the amount of money that AT&T receives from customers for using its cell network. They want some percentage of that. Think about all the pieces of equipment that go into a cellular network, thousands upon thousands.

But the only thing that's really at issue here is a base station. You don't have to believe me. Dr. Feuerstein said it. The only thing that's relevant to infringement is the base station. Yeah, he agrees. Yet they're trying to grab a percentage of all of the cellular revenues. And let's not mince words. That's why they sued AT&T rather than suing

Ericsson.

You heard Mr. -- Ms. Bennis say yesterday, look, if they had just limited their damages claim to the base stations and the amount of money that the base stations are sold for and make, that would reduce their damages by 95 percent; 95 percent.

There's a second high level thing to talk about on damages, and it's this:  You remember that everything in this claim, even the Plaintiff admits, was old; not something Mitsubishi invented; it existed.  And you remember when I had Mr. Dell, their damages expert, I said, sir, the purposes of damages is we're only supposed to be valuing what is new in the invention, and he agrees.  In fact, the Court just read you an none on that.  You're only supposed to value what's new.

The only thing new that didn't exist, at least according to them, even though we now know it really did, but according to them, the only thing that's new is that interference amount.

So did they value that?  We're going to talk about whether they did.  But Dr. Sundaresan again yesterday said something very important on this.  Mr. Lipschitz said, Sir, this interference amount, this is very complicated, isn't it?

Dr. Sundaresan said, Not at all.  It would -- it would involve one line of source code.  He called it an if/then

statement, one line of computer code.  And did you hear what he said?  Any high school student could do it.  That's their words, that's not me denigrating it.  Their own expert said any high school student could do this.  And they want $60 million for it?

I mean, common sense.  I agree with their lawyer, common sense does need to take over at some point.  Their own expert says the only inventive aspect, this interference amount, could be done by any high school student.

But it really gets a little bit worse, and I'll tell you what I mean.  Remember Dr. Kowalski, their very first expert.  By the way, did you notice that their first two experts related only to damages?  Dr. Kowalski said, I'm not saying anything about infringement and invalidity.  Mr. Padian said, I'm not saying anything about infringement and invalidity.  They both talked about damages before they said a word to you about whether or not they were entitled to any damages.

Dr. Kowalski was supposed to isolate that last inventive element related to interference amount, but when Mr. Mathews asked him, well, did you isolate that, no.  Remember he did this comparison between this thing called grid of beams and the RAT feature?  So what he was supposed to be doing is comparing something that used ingredient 1 and 2 to something that used ingredient 1, 2, and 3.  That would tell you what 3 was worth, but he didn't do it.  He said, I don't even know in

grid of beams I don't know if it uses ingredient 1 I don't know if it uses ingredient 2, I don't know what it uses.

So that 22 percent number that he came to invalidates the entirety of Mr. Dell's analysis; not to mention that it disregards the Court's very clear instructions.

I'll say this about Daingean and Mr. Dell's calculation. At every step of the way, remember like he had four, five, six steps and how to do the calculation. At every step of the way, it's inflated. It starts with grabbing the cellular revenues for AT&T; the amount of money that customers pay them for the entire network, not just for base stations. Then it goes to Dr. Kowalski's 22 percent that's not even calculated in the method and the way that the Court requires.

And then to top things off, Mr. Dell just assumes that if you have a 22 percent increase in speed in your network, that you would have this $1 for one percentage point increase in your money.

THE COURT:  Five minutes remaining.

MR. DACUS:  Thank you, Your Honor.

With absolutely no evidence.  No evidence at all.  He didn't present anything to say to you that there is this one-to-one correlation.

All the while, all the while, Mr. Dell is ignoring what is right there in front of his face.  And, again, you can go look at the Court's instructions.  Please look at page 20

1336

through 23.  It tells you how to calculate damages.  What he describes for you is this market approach of using comps.  And it's not complicated.  It's something that many of us have done in buying a house.  You look at the house that you're going to buy and see, Has that house been sold in the recent past or future?

What do we know about this '803 Patent?  Mitsubishi had it since 2013, over a decade.  Nobody sought to license it, nobody asked to license it.  All these sophisticated companies out there, these people claim that this is the savior for 5G, and nobody asked to license this patent.

It's sort of the proof is in the pudding.  It's not us saying it; it's the entire marketplace saying, we don't see the value in this '803.

So what the Judge has said in his instructions is look at comps, look at other similar patents that have very similar technology.  And what do they sell for, what do they license for.  And we know -- remember, I went through this with Mr. Dell?  And I won't go through it in detail, but you know the long and short of it is for very similar patents -- by the way, this IP Bridge patent they don't even dispute, they do not even dispute that it is technologically the same or comparable.  They don't dispute it.

And Mr. Dell said, Yeah, on average these are worth tens of thousands of dollars, tens of thousands of dollars to

license.  But instead these folks want tens of millions.

None of this is a precise science.  I can't tell you whether this thing's worth $370,150, but I can tell you what it's not worth--tens of millions of dollars.

It's a reasonableness check.  The truth is if you actually go look at comps, and Ms. Bennis showed you this precisely, the most reasonable number to license this patent if you were to get to it is the $370,000.  Do we think they should be awarded a penny?  Absolutely not.

I'll wind up here since my time is a little bit short.  I don't have to tell you again that the protector of the purpose of our patent system is you.  Our founders said we're going to leave it to the juries to protect the system and to prevent people from claiming things that are new that are not and from moving their fence lines once they get a patent.

AT&T and Ericsson absolutely believe in that purpose.  Between them, they have thousands of patents.  It's literally the backbone of their company in many ways.  The purpose is very much what they're here for.  The purpose of the patent system was not to go treasure hunting for a Rembrandt in an attic, not what it was about, not what it's about when it was founded, not what it's about today.

There's a lot of things that I think I could say that I believe from their actions show that this lawsuit is not about purpose of promoting the progress of science, but what I'll do

1338

is just leave it to your memory of the facts and evidence in this case, and I'll say this and stop.

We agree that something needs to stop, and that is, pursuing a lawsuit that has nothing to do with the progress of science.  I can't stop it, Mr. Loddeke can't stop it, Mr. Faxér can't stop it.  None of the men and women at Ericsson can stop it.  Only you, the jury, can.  And that is what we're here asking you to do is to stop that.

We fully recognize, fully recognize that it's your decision, not ours.  And regardless of what that decision is, we very much thank you for giving them the opportunity to present their case to you and we very much look forward to you returning your verdict.

I'm not going to get another chance to stand up.  I have no idea what this lawyer might say to you.  All I would ask you is, whatever he says, please think back to the evidence that you've heard in the case.

Thank you.

Thank you, Your Honor.

THE COURT:  All right.  Plaintiff may present its second and final closing argument.

You have 14 minutes remaining, Mr. Anaipakos.  Would you like a warning on this time?

MR. ANAIPAKOS:  Please, Your Honor, with three minutes left.

THE COURT: I'll warn you with three minutes remaining. You may now present your closing argument.

MR. ANAIPAKOS: Thank you.

I'm going to start by putting a smile on your face. I'm the last lawyer you have to hear from.

There are a lot of things I want to say in response to what was just said, but first, there are some things that Mr. Dacus and I agree on. For example, he said he wants you to go read page 12 of the instructions the Judge gave you, and I couldn't agree more. This is on the issue of that Ericsson interference sensing.

He read you an excerpt from it that says you have to put it into service and receive the benefits. To that I say amen, because that's exactly what they've done. They had EIS on a software release that they didn't have to take but they took it. And then what did they do with it? They put it on every single n77 base station they have; tens of thousands of them where it sits right this very second.

And they have to receive the benefits of it. That's an interesting question. Do you receive the benefits of having a car when you're not driving your car? Well, of course you do, because you can walk outside at any moment, get in your car, and go where you need to go. You have the car; it's available to you; all you need is the key. Same thing with EIS. They have it; it's on all their base stations--Lord know's why; and

1340

these folks just need the key from Ericsson.

And who's Ericsson?  Their largest supplier.  In other words, AT&T is one of their largest customers.  Think about that.

So please do look at page 12 and use your common sense when you do so.

Mr. Dacus talked about--and I tried to write this down as best I could--claim 12 of the '803 Patent.  He said the patent says, Pointed away from and we are pointed at it.  Pointed away from and pointed at it--remember those phrases.  Go read claim 12, as I'm sure you will.  You're not going to find those words anywhere in claim 12.  He's making up a new claim limitation.  Why?  They're trying to shrink our property. Claim 12 does not use that language.

If we could please look at back-up slide No. 12, please, Ms. Vela.

On this issue of whether the beams are not directed to, we proved our case through their documents.  This is Plaintiff's Exhibit 31.  Look at the beams on the box on the bottom left.  Those are the ones you know now.  They're narrow, they're tailored, they're going to those specific devices.

And then look at the way they describe it.  These are their words.  We are proving our case through their words. UE-specific beamforming, tailor the beam pattern to a

1341

particular UE, narrow and still track movement of the intended UE.  It goes down.  Enjoy a specific beam pattern with a strong peak.  There's no question that they're directing to a particular device and directing away from other devices.  Remember that schematic with all the crazy lines and all roads leading to Rome?  We've proven our case through their documents.

By the way, Mr. Dacus talked about that video that I showed you and he said, Well, that talks about interference inside the cell, and the patent's really about interference outside the cell.  I'd encourage you to listen to the video and find out who's right on that.

But regardless, when you look at claim 12, one thing you're not going to see is the phrase inter-cell interference, you're not going to see the phrase intra-cell interference.  It's not in there.  When we talk about those things, we're talking about whether and what the benefits of the patent are, not whether AT&T infringes it.  The instructions are very clear.  You're to look at the language of claim 12--not bring in other language, not change the language--look at the language of claim 12 and find out if we've shown that by a preponderance of the evidence or not.

Can I have rebuttal slide 11, please?

They go so far as to say that there is a conflict between Dr. Feuerstein and Dr. Sundaresan on this issue of being not

1342

directed to, and they showed you an excerpt from his testimony, but they didn't show you the rest, and it's on the screen now. "Is there anything in this claim that says the beam must be steered away from;" another phrase they like to use.

"Absolutely not. And I was trying to explain that. If you can look at the claim elements, it doesn't require you to steer away from things; it just says 'not directed to'."

Again, that's the law. That's what we know you're going to do. Look at the claim language and apply the facts to the claim language.

Can I have rebuttal slide No. 1, please?

Here it is from Mr. Faxér as well.

I'm sorry. This is the wrong slide. Can we have rebuttal slide No. 8, please?

Here it is.

Dr. Feuerstein: "So when you were testifying about whether a particular beam might be directed at an adjacent cell mobile device, what did you mean by that".

They tried to suggest to you that he somehow admitted it needs to be pointed, and at he clarified--and it's on the screen in front of you--that what he was talking about is compass directions; very different than what you heard.

Can I have rebuttal slide No. 9, please?

They also tried to suggest that there was some conflict

between Dr. Feuerstein and Dr. Sundaresan on this issue of 'on the basis of', and let's look at what Dr. Feuerstein actually said.  He said, "So it means that it's influenced by or affected by, so basically the beamforming needs to take into account the information in [D], [E], and [F]."

That's exactly what the claim requires here.

There was also a suggestion that in opening statement I told you-all that these beams look like these yellow triangles.  They've shown you that a few times.  I think you remember we were as clear as a bell that was just a way to explain these concepts to you at an introductory level and that's what they were.  In fact, I think you'll remember I referred to one of the beams as a tie-dyed turkey, so we talked about all sorts of different beams.

Ask yourselves why they have to misrepresent things like that to you, and the answer is very clear.  We don't have to do it because we're relying on their documents, their people, their videos, their source code.  When you come into court and you bring four pieces of paper and say, We don't infringe because we got these four pieces of paper, which is exactly what Dr. van der Weide did, this is the consequence of it.

So they stretch and they say things like, Well, Dr. Sundaresan said that any high schooler could do that.  That is just completely untrue, is the polite way to say it.  Dr. Sundaresan said that at the end of a very complicated

1344

process that patent results in a single line an if/then statement, and he said that when you get to that any high schooler can do it.  He certainly wasn't suggesting that any high school student could come up with this invention.

Could we please look at--let's see here--closing slide 16, please?

There was a suggestion that Dr. Feuerstein didn't rebut this honeycomb issue.  And it's on the screen in front of you. If you look at it, he talks about how this stuff happens millions and--I'm sorry--is measured in millions of a second. It's happening thousands of times every second.  That there are multipath; that that there are reflections that can bounce off of things, like the picture we saw with all the lines going to the same place.  And so what happens--there are slight delays.  There are slight delays.  So interference is heard.

And we saw that from Mr. Faxér earlier as well.  So he didn't admit -- he had a very clear response to this honeycomb.

And speaking of, remember when you see that honeycomb, what did their expert say about whether that looks like AT&T's network at all?  He said it doesn't resemble it at all. Remember that I showed AT&T's corporate representative a chart that showed that on average in reality their cells have ten neighbors?  Well, I learned in geometry, as I'm sure you did,

you can't have ten neighbors in a perfect hexagon.  Right?

Their network does not look like that.

If we could pull up rebuttal slide No. 6, please.

I'll talk to you about damages for just a few minutes.

If you remember, the Judge has instructed you on the left who the parties to the hypothetical negotiation are.  And what does the Judge tell us?  The Judge says that they are Mitsubishi and AT&T.  Now, in this approach that Ms. Bennis took--I have her slide on the right--what's the problem with it?  She's got an extra party there--Ericsson.  So right at the outset, she does her assignment wrong.  But then she says you've got to go look at the comps, look at the properties.  I encourage you to do that, because what did she do?  She picked the three cheapest ones she could find and used that --

THE COURT:  Three minutes remaining.

MR. ANAIPAKOS:  Thank you, Your Honor.

And used that to comp the value of this patent.  And at the end of the day, her opinion is that they should pay less to license the '803 than her firm has been paid for her to be here.  I tried to get them to answer that question.  AT&T didn't know, she didn't remember, but you could all tell what the answers were.

And even if you were to think for a second, You know what?  What about if we ignore Dr. Kowalski's 22.2 to 30 percent--he's sitting here so I'm not suggesting that for one

second--but if you did that and you looked at their documents, what would happen?  Every single result we showed you in document after document after document shows an improvement greater than that range.

And even Mr. Carpenter, remember he could -- this technology is used so actively he couldn't find a city that had 10 of them turned off, so he had to keep looking in more and more rural areas.  And when he found those--and we corrected them for a little bit more dense populations in that area--what did he find?  He found that improvements went up to 30 percent.

At the end of the day, there is no debate that these techniques in the '803 Patent are helping to reduce spectral efficiency, whether it's through speeds, reduced inter-cell interference, they're improving the spectral efficiency of that network, and that's worth a lot of money to AT&T.  It's an extremely important invention.

On the issue of validity, look at the Kim reference.  It needs one base station to do all three things.  It doesn't exist.  And in this area of the law, in order to take someone else's property away, that patent has to be identical.  And you heard from Dr. Sundaresan say the second base station cannot do all three things, it is not identical, and you cannot under the law take someone's property from them on something like that.

1347

Last words from me.  Thank you very much from all of the folks on our side of the case.  We know this has been a hard fight.  It is not easy for us to bring a case like this, and we very much appreciate your willingness to listen to the evidence.  We look forward to your deliberations and to your verdict.  Thank you very much.

Thank you, Your Honor.

THE COURT:  All right, ladies and gentlemen.  I'd like to provide you with a few final instructions before you begin your deliberations.

You must perform your duty as jurors without bias or prejudice as to any party.  The law does not permit you to be controlled by sympathy prejudice or public opinion.  All parties expect that you will carefully and impartially consider all the evidence and follow the law as I have given it to you to reach a just verdict regardless of the consequences.

Answer each question in the verdict form based on the facts as you find them to be, following the instructions that the Court has given you on the law.  Do not decide -- again, do not decide who you think should win the case and then answer the questions to reach that result.  And one more time let me remind you, your answers to the questions in the verdict form must be unanimous.

You should consider and decide this case as a dispute

1348

between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life. This is true even where one party is small and the other party is large. This applies in patent cases between corporations, partnerships, and even individuals. A patent owner is entitled to protect his or her rights under the laws of the United States, and this includes bringing a suit in a United States District Court for money damages based on claims of infringement. But by the same token, an accused infringer is entitled to defend itself against assertions of infringement, including by arguing that it does not infringe the asserted patents and that the asserted patent is invalid. The law recognizes no distinction between types of parties. All corporations, partnerships, other business organizations stand equal before the law, regardless of their size, regardless of their ownership, and they are to be treated as equals.

Now, when you retire to the jury room to deliberate on your verdict, as I've told you, you're each going to have your own printed copy of these final jury instructions. If during your deliberations you desire to review any of the exhibits which the Court has admitted into evidence, then you should advise me by sending me a written note signed by your foreperson identifying the exhibit or exhibits you want to see, and I will then send that to you. Just give that note to the Court Security Officer who will bring it to me. Also I

need to remind you again, demonstrative exhibits as opposed to actual exhibits administered into evidence, those demonstratives are not evidence and I will not be able to send those to you in the jury room.  Once you retire, you should first select your foreperson and then conduct your deliberations.  If you recess during your deliberations for any reason, continue to follow all the instructions the Court's given you about your conduct during the trial.

After you have reached your verdict, your foreperson is to fill in the verdict form with your unanimous answers to those questions, date it, sign it, and advise the Court Security Officer that the jury has reached a verdict.  Do not reveal your answers until such time as you are discharged, unless otherwise directed by me.  And you must never disclose to anyone, not even to me, your numerical division on any unanswered question.

Any notes, ladies and gentlemen, that you've taken over the course of this trial, they are aids to your memory only. If your memory should differ from your notes, rely on your memory and not your notes.  Notes are not evidence, and any juror who has not taken notes must rely on his or her recollection of the evidence and should not be unduly influenced by the notes of other jurors.  Notes are not entitled to any greater weight than the recollection or impression for each juror about the testimony.

1350

Now, if you want to communicate with me at any time during your deliberations, you should give a written message or a question signed by your foreperson to the Court Security Officer, who will bring it to me. I'll then respond as promptly as possible, either in writing or by having you brought back into the courtroom where I can address you orally. And I will always first disclose to the attorneys in the case your question and my intended response before I respond to any question you might send me.

Now, after you have reached a verdict and I have accepted your verdict and discharged you as jurors, at that point, ladies and gentlemen, I want to be clear--you're not required to talk with anyone about your service as a juror in this case, but by the very same token, at that time you are completely free to discuss your experience with anyone of your choosing regarding your service as jurors in this case. At that point in time when you've been discharged by me, whether you do or don't discuss your service in this case is 100 percent up to you.

I'm now going to hand one clean copy of the verdict form and eight printed copies of the final jury instructions to the Court Security Officer who will deliver them to you in the jury room.

Members of the jury, you may now retire to the jury room to deliberate on your verdict. We await your decision.

1351

(Whereupon, the jury left the courtroom.)

THE COURT:  Counsel, be sure before anything further happens that my staff has a good working cell phone number to reach both trial teams, if needed.  You are welcome to wait here in the courtroom.  If as I suspect you may wait outside the courtroom and off premises, make sure your phones are working so we can get you back here quickly if we get a note or when we receive a verdict.

Awaiting either a note from the jury or the return of their verdict, the Court stands in recess.

(Jury deliberates.)

THE COURT:  Be seated, please.

Counsel, we received the following note from the jury. And if you'll approach, Ms. Brunson will hand you a copy, one copy for each side.  I'm going to read it into the record and then we're going to talk about it.  And I'll mark this with a '1' in the upper right-hand corner for identification.

"Your Honor, we request the following exhibits listed below:  PX 73 page 3, PX 73 page 26, PX 73 page 34, PX 73 page 7, DX 94 page 12, PX 148 page 7, PX 159 from 6:11 to 6:24, DX 148 page 97, and JX 1."

The note is signed by Ms. Dawkins, Juror No. 3, who appears to be the foreperson.

Counsel, in anticipation of your arrival, we've pulled the following exhibits.  I have JX 1, I have PX 73, I have

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

DX 94, I have PX 148, and I have PX 159.  The note calls for a DX 148.  There is no DX 148.

This is my intended response.  I want to read it to you and then I'll hear any comments from either Plaintiff or Defendants.

"Members of the jury, in response to Jury Note No. 1, I am sending you the following requested exhibits:  PX 73, DX 94, PX 148, JX 1.  As to PX 159, the video shown during trial, the Court's technology staff person Mr. Edwin Perez will bring IT equipment to you and will play and display the video from 6:11 to 6:24, as you asked for.  He will then remove the equipment, unless you ask him to leave it with you.  Also, your note seems to identify DX 148; however, there is not a DX 148 within the admitted exhibits."

All right.  Does anybody have any objections to that response along with these hard copies being sent into the jury except for PX 159 which I'll give to Mr. Perez and he can take it in there on a monitor and laptop on a rolling stand that we already have put together and play that portion to the jury?

MR. ANAIPAKOS:  Your Honor, just a question.  Are you sending back the entire exhibit or simply the pages they requested?

THE COURT:  Rather than break the exhibits down and pull out the pages, my thought was send them the exhibits.  They can look at the pages they've identified, and if they

1353

think of something else, they'll already have the exhibit there.

MR. ANAIPAKOS:  Completely agree.  And with that clarification, Your Honor, the Plaintiffs have no objection.

THE COURT:  How about Defendants?

MR. LIPSCHITZ:  No objection, Your Honor.

THE COURT:  All right.  Let's see.  Mr. Perez, you're in the courtroom.  If you'll come forward, I'll give you the thumb drive that has PX 159 on it.  And if you'll get our existing equipment, take it around to the jury room, and it's 6:11 to 6:24.  I'm sure if they want to see something else, they'll tell you about it.

And then I'm going to execute this written response and I'll give it to Mr. Barnett the Court Security Officer along with the actual exhibits to deliver to the jury.  And I'll hand the original jury note to Ms. Brunson the Courtroom Deputy.  And I think that will cover it.

Awaiting either another note from the jury or the return of their verdict, we'll stand in recess.

(Deliberations continue.)

THE COURT:  Be seated, please.

Counsel, I've received the following message from the jury:  "Your Honor, we have a verdict."  And it's signed by Ms. Dawkins as foreperson.

I'll hand the original message to the Courtroom Deputy.

1354

Is there anything I need to hear from counsel on before I bring in the jury and receive their verdict?

MR. ALAVI:  Nothing from the Plaintiff, Your Honor.

MR. DACUS:  Nothing from the Defendants, Your Honor.

THE COURT:  All right.  It goes without saying, and I'm speaking to everyone in the room, that there are to be no outward or vocal reactions no matter what the verdict might be.

All right.  Let's bring in the jury, please.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Members of the jury, please be seated.

Ms. Dawkins, I understand that you're the foreperson of the jury.  Is that correct?

THE PRESIDING OFFICER:  Yes, Your Honor.

THE COURT:  Has the jury reached a verdict?

THE PRESIDING OFFICER:  Yes, Your Honor, we've reached a verdict.

THE COURT:  Would you hand the completed verdict form to the Court Security Officer who will bring it to me?

All right, ladies and gentlemen of the jury, I am going to read the verdict into the record at this time and I want you to each listen very carefully because after I have announced the verdict into the record, I'm going to poll the jury to make sure that this is the unanimous verdict of all eight members of our jury.

Turning to the verdict form and beginning on page 4 where Question 1 is found, "Did Daingean prove by a preponderance of the evidence that AT&T infringed claim 12 of the '803 Patent?"

The jury's answer is, "No."

Question 2 pursuant to the Court's instructions is not answered.

Question 3 pursuant to the Court's instructions is not answered.

On page 7, the final page of the verdict form, I see that it is dated with today's date, September the 11th, 2025, and it is signed by Ms. Dawkins as foreperson of the jury.

Ladies and gentlemen of the jury, let me poll you to ensure that this verdict that I've read into the record reflects the unanimous agreement of all eight members of the jury.  If this is your verdict as I have read it, would you please stand up?  Thank you.  Please be seated.

Let the record reflect that all eight members of the jury immediately rose and stood in response to the Court's question to poll the jury.  This confirms that this is the unanimous verdict of all eight members of the jury.  The Court accepts the jury's verdict and I'll deliver the original verdict to the Courtroom Deputy.

Ladies and gentlemen, this completes the trial of this case.  From the very beginning I have given you several instructions about your conduct and I have repeated and

1356

reminded you of those instructions throughout the whole process. Having accepted your verdict, I am now releasing you as jurors. You are no longer bound by any of the instructions that I gave you during the trial. That means you are perfectly free to discuss your experience as a juror in this case with anyone of your choosing. That also means that you are under no obligation whatsoever to discuss your experience as a juror in this case with anyone. That decision is 100 percent your own individual decision for each of the eight members of the jury.

If I was right when I told you at the beginning of process when you got home the first evening you were going to get a question when you walked in the door about, What happened in federal court in Marshall; you can now answer that question if you want to answer that question, but you're not under any obligation to answer that question.

Also, I need to make you aware of a long-standing practice and custom in this division, the Marshall Division. I've been practicing law here since 1981. I've been on the bench here since 2011. This was the custom and practice when I got here in 1981, it's been that way ever since, and it is as follows: There is one way in and one way out of this courthouse, and that's up and down those front steps on the front of the building. When you leave in a few minutes, do not be surprised if these lawyers on both sides have not

1357

conveniently positioned themselves on the sidewalk at the bottom of those stairs. They are going to make it very easy for you to stop and initiate a conversation with them, because whether they are on the Plaintiff's side or the Defendants side or the Intervenor's side, they care about your reactions and your judgments and your evaluation of how they conducted themselves during the trial.

They would like to have a conversation with you, but that is not their decision; it is your decision. And if you would like to stop and talk with one or more of these folks, I promise you they'll make themselves available to you. If you don't want to stop and talk to anybody, nobody is going to initiate a conversation with you, no one is going to get in your way or make it hard for you to walk to your car, nobody's going to do anything to hinder you in any way; they're just going to make it convenient in case you want to decide and have a conversation.

It's Been that way for a long time when I got here practicing law in 1981; it's been that way ever since; probably will be as long as this courthouse stands and juries return verdicts in this building. I just want you to be aware of that.

So if you'd like to have a conversation, have one, have two, have 10. It will be up to you. If you don't want to, nobody is going to get in your way or cause any problem about

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

1358

you just walking straight on by.  But I don't want you to be surprised when you walk down the steps and exit the building and you see a whole lot of people in dark suits standing at the bottom of the steps making themselves convenient to you. I just want you to be aware of that.

Also, ladies and gentlemen, I know it's been a long trial, you've been very cooperative, you've been very patient. I'm very appreciative of the way you've conducted yourselves over the course of this trial.  I know several of you had fairly long distances to drive everyday, and even though we were here past 6:00 some evenings, I didn't hear any grumbling or complaining.  And because we were able to front-load this trial here, we are on Thursday and we finished, which when we selected the jury last Friday I told you I thought we'd be finished either Thursday or possibly at the latest Friday, but you're the reason we've been able to keep that schedule, and I thank you for it.

I do want to ask one personal favor of you now that the trial's complete and I've discharged you as jurors.  I'd like you when you stand up in a few minutes to go back to the jury room and let me have an opportunity to come into the jury room because I would like to shake each one of your hands and I'd like to look each one of you in the eye and tell you personally thank you for your service.  I think what you've done warrants that kind of personal attention and a personal

1359

expression of thanks and appreciation, because the court recognizes--and I mean not only myself, but everyone involved in the court--everyone recognizes that we are dependent upon you and your willingness to be good citizens, to put yourself forward to make the sacrifice--and every one of you have--to make the sacrifice to serve as a juror is an important act of public service, and it warrants a specialized and a personalized word of thanks.  I am not going to keep you very long, just a few minutes, but if you would do me that personal favor before you leave the building, I would very much appreciate it.

With that, ladies and gentlemen of the jury, that completes the trial in this case.

Counsel, you are excused.

Ladies and gentlemen, I'll meet you in the jury room.

(The proceedings were concluded at 1:30 p.m.)

I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER. I FURTHER CERTIFY THAT THE TRANSCRIPT FEES FORMAT COMPLY WITH THOSE PRESCRIBED BY THE COURT AND THE JUDICIAL CONFERENCE OF THE UNITED STATES.

S/Shawn McRoberts                    09/11/2025

_____DATE_____
SHAWN McROBERTS, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER